WILLIAM P. VAN RENSSELAER vs. JOHN N. SMITH.

STEPHEN VAN RENSSELAER vs. ROBERT HAYES.

STEPHEN VAN RENSSELAER vs. PETER BALL.

ROBERT CHRISTIE and others, assignees of William P. Van Rensselaer, vs. DAVID DE FRIEST.

Covenants, in leases in fee, to pay rent, fasten themselves upon, and run with, the land, as to their burden, and may be enforced against the assignee.

A covenant is capable of running with the land, although not directly to be performed on it; provided it tends to increase or diminish the value of the land, in the hands of the holder.

Under our laws, the relation of landlord and tenant is made to exist as between the grantor and grantee in a conveyance in fee of manor lands, reserving rents. A statute privity is created—enough to pass a covenant to pay rent to each subsequent assignee of the land conveyed.

The lessor's interest in such a lease, is an entity assignable, with its remedies, as against the assignees of the lessee; to be enforced by entry for non-payment of rent, or other forfeiture.

The lessor's interest, as well in his own hands as in those of his assignees, is, *pro hac vice*, equivalent to a reversion.

The right of entry reserved in a lease in fee, with the remedies for enforcing it, are assignable by the lessor, so as to authorize the assignee to bring ejectment in his own name.

The statute remedy of re-entry by ejectment has been applicable by and to the parties to such leases; which remedy is not impaired by the statute of 1846, abolishing the remedy by distress for rent.

Leases in fee, reserving rents, are valid; and the estates and rights of both lessor and lessee under the same, are assignable, and capable of being enforced according to their tenor.

What is a sufficient notice of intention to re-enter, for non-payment of rent, prior to bringing an ejectment. under the act of 1846.

THE first of the above actions was brought for the recovery of rent accrued under three several demises in fee, of lands in Schodack, Rensselaer county, in all of which Stephen Van Rensselaer was the lessor. The first was executed June 26, 1790, to Jacobus Decker, his heirs and assigns. The second was executed to Samuel Hitchcock, his heirs and assigns, on the 4th of September, 1794. The third was executed to Jacob Smith, his heirs and assigns, on the

Van Rensselaer *v.* Smith.

7th of November, 1794. Each lease contained a covenant on the part of the lessee, for himself, his heirs, executors, administrators or assigns, to pay to the lessor, his heirs or assigns, the rents reserved. Stephen Van Rensselaer, by his last will and testament, executed on the 18th day of April, 1837, devised the said rents, and all his right, title and interest in the demised premises, to the plaintiff. The defendant was in possession of portions of the demised premises, claiming title through the original lessees. The defendant demurred to the complaint, on the ground, among others not necessary to be stated, that it did not state facts sufficient to constitute a cause of action. The demurrer was overruled, at a special term, and judgment was entered for the plaintiff for $531.76, besides costs. From that judgment the defendant appealed to the general term.

The second action (against Hayes) was also brought for the recovery of rent, which was claimed to have accrued upon a lease in fee, of lands in Berne, Albany county, executed by Stephen Van Rensselaer to Jacobus Dietz, his heirs and assigns, on the 15th of February, 1796. This lease also contained a covenant on the part of the lessee, for himself, his heirs, executors, administrators and assigns, to pay to the lessor, his heirs or assigns, the rent reserved. The defendant was sued as the owner of 128 acres of the demised premises. He put in an answer denying the material allegations in the complaint. The cause was tried at the Albany circuit, in January, 1857, before Justice W. F. ALLEN, without a jury. The justice found and decided the several issues of fact in said action as follows : He found and decided that the indenture, or lease in fee, alleged in the complaint, was executed and delivered by the parties respectively thereto, as alleged in the complaint; that the lessee became seised and possessed thereunder of the demised premises ; that said lessor or grantor, Stephen Van Rensselaer, died on the 26th day of January, 1839 ; that by his will and testament duly executed, and the subsequent assignments, grants and conveyances, as alleged in the complaint, the plaintiff became seised

Van Rensselaer *v.* Smith.

in fee, and owner of the rent reserved in and by said lease or indenture, at the times respectively alleged in the complaint; that the defendant, before the first day of January, 1840, by assignment, became owner of all the estate and interest of the lessee in 128 acres parcel of the lots so leased to Jacobus Dietz, and continued such assignee until the time of the commencement of this action; that the proper proportion of the rent accrued for and on account of the lands of which the defendant was assignee as aforesaid, for the periods respectively above stated, amounted, with the interest thereon, to the sum of four hundred and eighty-three dollars and seven cents; which sum he found and decided to be due and owing from the defendant to the plaintiff, and directed judgment to be entered therefor, with costs. From which judgment the defendant appealed to the general term.

The third action (against Ball) was ejectment for the recovery of demised premises, for the non-payment of rent. The complaint set forth a lease in fee, of lands in Berne, Albany county, executed on the 20th of October, 1792, by Stephen Van Rensselaer to William Ball, his heirs and assigns. The lease contained a covenant on the part of the lessee, for himself, his heirs, executors, adminstrators and assigns, to pay to the lessor, his heirs or assigns, the rent reserved; and a provision that if the rent, or any part thereof, should be behind and unpaid for the space of 28 days, it should be lawful for the lessor, his heirs and assigns, either to prosecute for the recovery of the same, or to enter and distrain for said rent; and that for want of a sufficient distress upon the demised premises to satisfy the rent, the lessor, his heirs and assigns, might re-enter, and repossess and enjoy the premises as in his and their former estate. The complaint alleged that, by virtue of the said lease, the lessee became seised of, and took possession of the demised land and the appurtenances; that the land had, ever since the execution of the lease, been held and possessed by virtue of and under the same, by the lessee and his heirs or assigns; that the

lessor, Stephen Van Rensselaer, was the owner and seised in fee of the premises, at the time of his death; that all the estate, right, title and interest of the lessee, of, in and to a part of the demised premises, by assignment legally made, came to, and vested in, the defendant; that such part was an equal undivided part; and was the one half of the lot so leased to William Ball; and that John Ball at the same time became, and now is, the assignee of the other undivided half part of the demised lot; that on the 18th of April, 1837, Stephen Van Rensselaer, by his last will and testament, duly made and executed, gave and devised to the plaintiff, his heirs and assigns, the said rent, and all the estate of the lessor of, in and to the said demised premises, and died on the 26th of January, 1839, leaving said will in force. The complaint then alleged a breach by the defendant, in the non-payment of rent by him for fifteen years, from 1840 to 1854, both included, for the demised premises of which the defendant was assignee, and after he became, and while he was, such assignee. The complaint alleged the service upon the defendant and John Ball, more than fifteen days prior to the commencement of the action, of a notice in writing of his intention to re-enter, in pursuance of the covenants and conditions of the lease. The complaint also alleged that the defendant was in possession of the demised lot and premises, and the plaintiff claimed a judgment against him for the recovery thereof. The defendant, by his answer, denied that he ever was the assign or assignee of the plaintiff; that he did, by assignment or otherwise, become seised of, or vested with, or was legally the owner of all the estate, right, title, interest, claim or demand of the lessee, or to any part of the premises therein described. And the defendant alleged that he never undertook, promised or agreed to pay the plaintiff any or either of the rents, or perform any or either of the covenants or conditions in the complaint mentioned; and he alleged that he never became seised or vested with the title to said premises, or any part thereof, subject to the payment by

him to the plaintiff of the rent, or performance of said condition, or any or either of them, and is not liable to pay the same, or fulfill any part thereof. And that if the plaintiff was entitled to recover of the defendant, he was entitled to claim only the rent for one year, of the premises he had occupied, according to the statute under and by virtue of which this action was brought, and that no recovery of the premises from the defendant, by the plaintiff, could be had, because this action was improperly brought. That this action was brought for this reason, to wit: that the forfeiture complained of is for the breach by the lessee or his assigns, of conditions contained in the original lease of Stephen Van Rensselaer to one William Ball, of the premises mentioned in the complaint. And the defendant averred that the action was not properly brought, under the act passed May 13, 1846, entitled "An act to abolish distress for rent, and other purposes." And that the statute above referred to is inapplicable to this action, and that the plaintiff is not, by virtue thereof, entitled to recover of the defendant the premises. And the defendant further alleged that divers other persons, naming them, were each and all interested, and must be joined as defendants in this action; and that they owned, occupied and possessed, held, claimed and enjoyed portions of the lands sued for, by virtue of warranty deeds executed by the lessor, Stephen Van Rensselaer, and wife, and ought to be made parties to this action as defendants. And that the plaintiff ought not to have or maintain this action for this, to wit: that all persons or parties in interest were not joined, either as plaintiff or defendants; and further, that the defendant had never, nor does he now, own, occupy or possess, one equal undivided half of the premises (to wit, 121½ acres of land) mentioned and described in the complaint. And the defendant objected to the complaint, that it did not state facts sufficient to constitute a cause of action.

On the trial, at the Albany circuit, in January, 1857, before Justice W. F. ALLEN, without a jury, after the plaintiff had

rested, the defendant insisted that the plaintiff was not entitled to maintain the action, because, 1. The complaint did not state facts sufficient to constitute a cause of action. 2. That the plaintiff had not proved facts sufficient to constitute any cause of action. 3. That it did not appear from the will introduced in evidence, or otherwise, that the plaintiff was entitled to maintain the action. 4. That the plaintiff cannot maintain this action because there is no privity between the parties, either of contract, or estate. 5. That the defendant, as assignee, is not liable to be proceeded against in this action, by re-entry for breach of the condition for the non-payment of the rent. 6. That it does not appear that there was any formal demand made of the rent when due and payable, and therefore the action is not maintainable. 7. That it does not appear that the plaintiff had at the time he commenced the action, or now has, any possibility of estate or interest in the premises sought to be recovered, and therefore this action is not maintainable. 8. That it does not appear that any forfeiture of the estate was incurred at any of the periods, when it is claimed that the rent became due and payable, and therefore the plaintiff could not recover. 9. That the covenant, the non-performance of which the plaintiff claims is a violation of the condition for alleged breach of which this action was brought, was personal to the original grantee, and not attached to the land, and therefore the plaintiff cannot recover. 10. That the condition is repugnant to the estate granted. 11. That the plaintiff is not entitled to recover under the revised statutes, which provide an action of ejectment whenever half a year's rent, or more, shall be in arrear from any tenant to his landlord, and no sufficient distress can be found on the premises to satisfy the rent, and therefore the plaintiff cannot recover. 12. That the plaintiff is not entitled to recover under that statute because the conventional relation of landlord and tenant does not exist between him and the defendant. 13. But were it otherwise, the statute of 1846, abolishing distress for rent, excused the defendant from fulfilling the condition of keeping on the

premises sufficient distress to satisfy the rent, and therefore in effect repealed the statute, which gives an action for the non-fulfillment of the condition, and therefore the plaintiff cannot recover. That this action is not maintainable under the act abolishing distress for rent. 14. But had a forfeiture actually occurred, the plaintiff waived it by subsequently serving the 15 days' notice under the statute of 1846. 15. That the statute of 1846, providing for a re-entry in certain cases does not give an action of ejectment, and therefore formal re-entry was required before bringing the action. 16. That the 3d section of the act of 1846 abolishing distress for rent, applies only to cases of landlord and tenant, and therefore this action, based upon the service of the notice provided by that section, is not maintainable. 17. But were it otherwise the notice should have been served before, and not after the rent fell due. 18. The service of the 15 days' notice was bad because not made personally upon the defendant. 19. That the action was not maintainable, because the summons was not served upon the defendant for more than one year, viz. 13 months after leaving the 15 days' notice upon the premises. 20. That no more than one day's service with carriage and horses was collectible, and therefore the action is not maintainable. 21. But if otherwise then such service is not collectible of the defendant, as assignee, because such service is to be performed off of, and does not touch or concern, the demised premises, and therefore the action is not maintainable. The court overruled all these objections, and the defendant excepted. Judgment was entered in favor of the plaintiff, that he recover the premises in question, and hold them in fee simple; and the defendant appealed.

The fourth action (against De Friest) was also an action of ejectment, for the non-payment of rent, brought by the plaintiffs as assignees in trust for the benefit of the creditors of Wm. P. Van Rensselaer. The complaint alleged that in 1790 Stephen Van Rensselaer leased in perpetuity the lands claimed, to John Bloomendale, his heirs and assigns, reserving rent. The

lease was executed by the lessee, and contained a covenant on his part, for himself, his heirs, executors, administrators and assigns, to pay to the lessor, his heirs or assigns, the rent reserved. It contained, also, a clause of distress, and a right of re-entry to the lessor, his heirs and assigns, in case any part of the rent should remain unpaid for 28 days after the same was due; or in case no sufficient distress could be found upon the premises; or in case any covenant or condition should be broken. In January, 1839, Stephen Van Rensselaer died, leaving a last will and testament, by which he devised to Wm. P. Van Rensselaer the rent reserved by the said lease, and all his estate, right, title and interest in said premises. In Sept. 1848, William P. Van Rensselaer conveyed all his estate, right, title and interest in and to the said premises, and the rents then due or to grow due thereon, to Andrew White, Charles B. Lansing and James C. Bell, in trust for the benefit of his creditors. The assignees assumed the duties of the trust. In July, 1851, Robert Christie, jun. was by an order of the supreme court, substituted as trustee, in the place of said White and Lansing. The complaint further alleged that the defendant was in possession of a part of the demised premises, claiming title under the original lessee John Bloomendale, and the said lease. That rent for eight years was in arrear, and no sufficient distress could be found upon the premises. That more than fifteen days prior to the commencement of this action, notice in writing of the plaintiffs' intention to re-enter was served upon the defendant. The defendant demurred to the complaint, specifying the following grounds of objection:

"*First.* For that it appears upon the face of said complaint, that there is a defect of parties defendant, in that the allegations of the complaint show that the premises the possession of which the plaintiffs claim to recover have been since the execution of the indenture which is the alleged foundation of their action, and still are held and occupied by John Bloom-

endale, his heirs and assigns, and therefore John Bloomendale, his heirs and assigns, are proper and necessary parties.

*Second.* For that it appears from the said complaint, that several causes of action have been improperly united in this action, in that they claim to recover in the same count, on account that no sufficient distress can be found on the premises, and also on account that they have served a notice of their intention to re-enter, more than fifteen days before the commencement of the action; also that they claim to recover alternately, two severally described pieces of land in the same count.

*Third.* For that the said complaint does not state facts sufficient to constitute a cause of action. In that, among other things, it does not appear, 1. That the plaintiffs are the assignees of Stephen Van Rensselaer, the alleged grantor or lessor of the said indenture. 2. It does not appear that the defendant is the assignee of the said premises of the said grantee or lessee. 3. It does not appear that the plaintiffs are the landlords of the said premises. 4. It does not appear that the defendant is the tenant of the said premises. 5. It does not appear that the relation of landlord and tenant exists between the plaintiffs and the defendant as to the premises in question. 6. It does not appear that the plaintiffs served a notice of their intention to re-enter, on the alleged lessee or grantee of the said premises, either personally, or by leaving it at his dwelling house on the said premises."

The demurrer was overruled, with liberty to the defendant to answer within twenty days, on payment of costs. And the defendant not having put in an answer, within the time, judgment was given, that the plaintiffs recover the possession of the premises, with costs. From this judgment the defendant appealed.

*A. Bingham,* for the defendants (appellants.) *First,* in behalf of the defendants Smith and Hayes. I. By the common or feudal law, a grant in fee did not pass the right of property, but only the right of possession. The grantor remained the

lord of the soil, notwithstanding the grant. It created the relation of landlord and tenant, equally with a lease for life or years. There was no difference except in possible duration. In each there was tenure, or privity of estate, between the grantor and grantee, constituted by the one party having the right of property, or, as more commonly called, the reversion, and the other, merely the right of possession, subordinate to the reversion or right of property. (*Litt.* §§ 214 *to* 217. *Butler's note to Co. Litt.* 192 *a.* 3 *Kent's Com.* 495, 506.)

II. Covenants, concerning the land, made by parties thus connected in estate, run with the land. But, without tenure, no covenant can be attached as a burden thereon. And, with tenure, covenants which do not concern the land cannot be made to run with it. (*Spencer's case,* 5 *Coke,* 16. *Same case,* 1 *Smith's Leading Cases and Notes,* 22. *Milnes* v. *Branch,* 5 *Maule & Selwyn,* 411. *Rawle on Covenants for Title,* 341, 2, 2d ed. *Vernon* v. *Smith,* 5 *Barn. & Ald.* 1.)

III. All the authorities agree, that there must be privity of estate in order to attach the burden of covenants to the land. To constitute privity of estate, the position of the parties must be such as would formerly have given rise to the relations of tenure. (*Hare's note to Spencer's case.* 1 *Smith's Leading Cases,* 4th *Am.* ed. 127.) "Privity of estate," says *Platt, on Leases,* (2d *Vol. p.* 351,) "is the result of tenure; it subsists by virtue of the relation of landlord and tenant."

IV. The rule by which covenants are attached to lands, is not an arbitrary one, founded in mystery; but rests upon reasons clear and obvious. Because the landlord has the right of property, he receives rent from the tenant as compensation for the possession. Covenants to repair, or to insure, are for his benefit in protecting his reversion. But it is only as the owner of the reversion, that they are beneficial to him, and it is only while such owner, that he can enforce them. Consequently when the reversion passes by descent or devise, or by conveyance, the covenants pass along with it, as incidents, and the parties acquiring the right of property alone can enforce

them. This doctrine is well illustrated in *Pollock* v. *Cronise*, (12 *How. Pr. Rep.* 363.) The covenant is beneficial in such case, to the covenantee, not as a covenantee simply, but as owner of the reversion. Hence it is called a real covenant. For an example of a personal covenant as contradistinguished from a real one, take the case of a grant in fee under the statute of *quia emptores*, with covenants to pay the purchase price in annual installments. Here is an instance where the covenant is beneficial to the covenantee simply as covenantee, without regard to any reversion or estate in land. It does not depend upon whether he remains the owner of the reversion, for he has no such ownership. Hence the rule of *Balley* v. *Wells*, (*Wilmot's Notes, p.* 344,) and of *Vernon* v. *Smith*, (5 *Barn. & Ald.* 1,) sanctioned by *Allen* v, *Culver*, (3 *Denio*, 296,) and by *Dolph* v. *White*, (2 *Kern.* 296.) *See opinion of Marvin, J., in case last cited, pp.* 301 *and* 302.

V. The facility of attaching covenants and conditions to lands upon every feeoffment soon became obnoxious. Each successive grantee when he granted in fee constituted himself a landlord, with rents reserved and other incidents of tenure, In process of time the intermediate landlords between the chief lord and the occupying tenant became so numerous as to consume the greater part of the profits of the land, before the chief lord could be served. The evil was continually increasing, and it threatened to end in starvation to the hindmost.

VI. To remedy the evil, the statute of *quia emptores* was enacted. Its object was to make it impossible to attach covenants and conditions as burdens upon alienations in fee. True it only provided, that thereafter every freeman might sell his lands and tenements at his own pleasure, so that the feoffee should hold the same of the chief lord of the fee. That was the direct effect. It made every grant in fee the absolute alienation of all the estate of the grantor. In other words, it left no property or estate in the premises between the grantor and grantee. It blended the right of property,

and the right of possession, in one and the same person. (*Butler's Note, Litt.* 191, *a.*)

VII. That was the direct effect of the statute of *quia emptores,* in England. Had no other effect followed, it could not have cured the evils. If covenants and conditions could have been attached to lands upon grants in fee, just as well after that statute as before, as held in the recent cases of *Main* v. *Feather,* and *Van Rensselaer* v. *Bonesteel,* then that statute failed of the end intended.

VIII. The statute *quia emptores* has, however, been attended with an indirect and consequential effect. It did not forbid parties to make covenants, nor declare any covenants, when made, void, nor any conveyances containing certain covenants, inoperative. But it accomplished its purpose more surely than could have been done by mere inhibition. It left the grantor and covenantee, with no estate, thereby removing the only foundation upon which covenants and conditions could be imposed. They could only pass as incidents to some estate of the party in whose favor they were made, consequently making a grant in fee a conveyance of the grantor's entire estate, left him without any estate to which covenants could be annexed. So it has been understood and such has been the effect accredited to it, for more than 500 years, in England and in this country, since it has been subject to laws, excepting the two cases last above named.

IX. The statute of *quia emptores* was enacted in this state in 1787, to take effect from 1776. It was the law of the state when the grants and their covenants, as presented in this case, were made. Hence the grantor, Stephen Van Rensselaer, by the grants in question, parted with his entire estate, and the grantees took the absolute rights of property. They held of the people in their sovereign capacity, in whom, by the statute of 1779, had been vested the right of escheat, and who therefore became the only chief lord known or recognized in the state.

These are questions fully settled by *De Peyster* v. *Michael,* (2 *Seld.* 467,) *Rawle on Covenants for Title,* ch. 8.

X. The relation of landlord and tenant was not created by the deeds in question. No privity of estate was left between grantor and grantees. The covenants were for the purchase price of the absolute right of property, and not as a compensation for the use and possession. They could be beneficial to the covenantee only as covenantee, without regard to his continuing the owner of the reversion or of any estate in the land. They were therefore, according to every rule and every authority, merely personal and collateral.

XI. The burden of covenants can never run with land outside of the relation of landlord and tenant. Smith, in his note to Spencer's case, (1 *Smith's Leading Cases,* 37,) after reviewing all the authorities upon that point, says: "Upon the whole, there appears to be *no authority* for saying that the burden of a covenant will run with land in any case, except that of landlord and tenant; while the opinion of Lord Holt, in *Brewster* v. *Kitchell,* that of Lord Brougham, in *Keppel* v. *Bailey,* and the reason and convenience of the thing all militate the other way."

XII. Rent reserved from a tenant to a landlord is rent service, no matter how or in what manner to be paid. (*Litt.* 216.) Where reserved to a stranger to the land, that is to one who had no estate or reversion, it was void, for it could not be collected. It was then called *rent seck.* (§ 215.) When there was added thereto a right to distrain, it was called *rent charge.* (§ 217.)

XIII. *Rent service* runs with the land, because it is a render—a retribution by one party for the possession of another's land. Rent charge, or rent seck, does not run with the land, for it is not a render for the use and occupation, but a gross sum, unconnected with the land. It may be for the purchase price, or for money borrowed, or to secure any other indebtedness. But it is a very different thing from rent, and bears no analogy to it. (*See Mr. Hare's note to Spencer's case,* 1

*Smith's Leading Cases, 4th Am. ed. p.* 124, *and authorities there cited; Rawle on Cov. for Title, ch.* 8, *pp.* 341, 342 ; *Smith on Real and Personal Property, p.* 11 ; *Burton on Real Property,* §§ 1102, 1103, 1108, 1109.)

XIV. The statute of 1779, (1 *Jones & Varick,* 44,) and the statute of tenures, (1 *R. L.* 70,) performed the same functions, and wrought the same changes, in the feudal tenures of the state, as the statute of *quia emptores* did in England. Under the operation of those statutes, no rent service could be reserved, on a total alienation of the estate. The relation of landlord and tenant could not be created by such a conveyance. All rents reserved upon grants in fee were either rents charge or rents seck, and it is immaterial which, so far as it regards the question whether the covenants run with the land. (*De Peyster* v. *Michael,* 2 *Selden,* 467. *See page* 504 *et seq.*)

XV. Heretofore, rents of this kind have been assumed to run with the land, on the ground that they were rent service—that the parties were landlords and tenants. It has never been so decided, but always so assumed, on the further assumption that the statute of *quia emptores* had not been enacted in this state. (*Van Rensselaer* v. *Bradley,* 3 *Denio,* 135. *Same* v. *Jewett,* 2 *Comst.* 135. *Same* v. *Snyder,* 3 *Kern.* 299.) It is true of all the cases on the subject. But the De Peyster case has virtually overruled those cases, by determining that the relation of landlord and tenant does not exist. The rules of that relationship are not, therefore, applicable. And if such covenants are to be held attached to the land, some new mode of fastening them must be invented. They cannot be annexed by any rule now recognized.

XVI. To determine correctly, it is necessary to forget that any such relation as landlord and tenant ever existed. Failure to do that led to the errors of *Main* v. *Feathers,* (21 *Barb.* 646.) (1.) The equities were pronounced against the defendant, on the ground that the rents run with the land, thereby diminishing the value and the price paid by the grantee;

forgetting that if they did not run with the land, neither the value of the land nor the price paid for it, would be diminished thereby; also erring in assuming an analogy between covenants which benefit, and those which burden. The law is well settled otherwise. (*Rawle on Cov. for Title, ch.* 8, *p.* 342, 2*d ed. Notes to Spencer's case,* 1 *Smith's Leading Cases, pp.* 30, 31.) It was also held against defendant, that his receipt of the profits created a moral obligation to pay; overlooking the fact that he was only receiving the profits of his own property, and could not, therefore, be liable to render therefor to a stranger. (2.) The covenants were held to be attached solely on the ground that there was a remedy of distress provided by the contract; that that gave an estate in the land to which the covenant could be attached. There is no such remedy in the case before the court, nor was there in *Main* v. *Feathers.* But it is not material. Such a distinction has no foundation in principle or authority. On the contrary, it has been expressly decided the other way. The point was distinctly made in the De Peyster case, that "the rent reserved with the right of distress, irrespective of the other reservations and conditions, is real estate; and under a *new name* is a portion of the entire estate which the lessor had in the premises." (2 *Selden,* 479.) It was as expressly decided, that "it is not a reversion, nor is it the possibility of reversion, nor is it *any estate* in the land." In 2 *Selden,* 506, 508, Ruggles, Ch. J., says: "The arguments above referred to in favor of the condition to pay sale money, are founded on the proposition that the reservation of rent and the right of re-entry, are interests in the land remaining in the lessor, analogous to a reversion, and equivalent thereto, for the purpose of sustaining the validity of the condition. But there is no legal equivalent for a reversion for that purpose. The argument is an attempt to introduce a new reason never heretofore regarded as sufficient for supporting the condition. The reasoning from analogy is still more frail and feeble." These remarks of Judge Ruggles are as applicable in this

case as they were in that. (3.) The position that the terms "yielding and paying," attached a condition to the fee, has no foundation in principle, and is in conflict with all previous decisions. In *Hayes* v. *Beckerstaffe,* (2 *Mod.* 35,) it was decided that those terms did not create a condition, nor give a right of entry. In *Jackson* v. *McClallen,* (8 *Cowen,* 296,) it was said by Savage, Ch. J., that "a lease of land, paying rent, is no condition." In *Tallman* v. *Coffin,* (4 *Comst.* 138,) those authorities are commented upon and approved. These were all cases of landlord and tenant. If such words create no condition in such relation, much less can they as against an absolute owner, in favor of a stranger.

XVII. The case of *Van Rensselaer* v. *Bonesteel,* expressly decides that the doctrine that tenure, such as characterizes landlord and tenant, is necessary to attach a covenant to pay rent to the land, is a fallacy; that it is enough that the estate passed between the covenanting parties. It is the first case ever reported, holding such a doctrine. Its positions are erroneous: (1.) In holding that an estate must pass between the covenanting parties. That is not necessary. The covenantor may be, and may always have been, a stranger to the land. It is enough that the covenantee had an estate at the time. (*Rawle on Cov. for Title, chap.* 8, *pp.* 32, 33, 2d. ed.) (2.) In holding that it is enough that an estate passed between the covenanting parties. Within that rule, a covenant for purchase money, or almost any other which might be inserted or made on the alienation, would run with the land. No real estate owner could know the extent of his liabilities, incurred through successive alienations, in the progress of years.

XVIII. The introduction of such a doctrine would disorganize the rights of property established upon rules sanctioned for centuries. It would introduce a system of burdens worse than the feudal, without any of the benefits. There is nothing in our present constitution, or laws, to prevent such grants and such covenants, as are presented in this case. Par-

ties are at liberty to alienate when they please, and take covenants for the purchase price in a definite or an indefinite number of installments. There is nothing to prevent covenants to pay a certain sum annually forever, any more than a certain annual sum for fourteen successive years. The constitution only inhibits the reservation of rent beyond twelve years. That is, a term having application to tenure, to landlord and tenant. Will any one pretend that it forbids the vendor of lands from making arrangements for receiving his purchase money in installments extending beyond twelve years? If not, why cannot it be made in perpetual installments? It is evident that the constitution embraces only tenures, or relations of landlord and tenant, and the attachment of covenants thereto, because, in that way, they could run with the land, and burdens could be created by one generation to be borne by succeeding ones. If the doctrine of the Bonesteel case be correct, they should have limited the number of installments, or the maximum length of time in which they were to become due.

XIX. Even at common law, before the statute of *quia emptores*, a party could not be liable for covenants running with the land, unless he was the assignee of the grantee, that is, had the entire estate or fee. It does not appear that the defendant was such assignee. It is alleged that he was in possession, claiming title. That may be true without his owning the estate of the grantee.

*Second*, in behalf of the defendants Ball and De Friest. I. Ejectment is a possessory action. It is not brought to acquire title, but to get possession by one who has title. 2 *R. S.* 303, § 3, have provided that no person can recover in ejectment unless he has, at the time of commencing the action, a valid subsisting interest in the premises claimed, and a right to recover the same, or to recover the possession thereof.

II. The first thing which the plaintiffs must make out, in order to get possession, is that they had the right of prop-

erty when they commenced the action. Instead of alleging title in themselves, they show the contrary. They allege, in the case of De Friest, that in 1790 Stephen Van Rensselaer owned the premises in fee, and then conveyed the same in fee to one John Bloomendale, his heirs and assigns forever. They further allege that the said Bloomendale then became seised of the estate and took possession, and that the same have "*ever since*" "been held and occupied by the same John Bloomendale, his heirs and assigns." There is a similar allegation in the case of Ball. How then does it appear that the plaintiffs had the right of property, entitling them to this judgment?

III. The theory of this action is, that the plaintiff's right of recovery rests on the right of re-entry for condition broken. At common law, a grant in fee reserving rents, created the relation of landlord and tenant. The rent was a rent service, and the owner thereof also owned the land. The right of property, and the right to the rent, always went together. They were inseparable. Hence, in an action like this, the only point to litigate was, whether the tenant had forfeited his right of possession. The plaintiff's title, when he had shown himself the landlord, could not be disputed. The only question was, not whether the plaintiff should again acquire title, but whether he should resume possession of property, the title to which he had never parted with.

IV. Under the statute of *quia emptores*, a grant in fee passed the entire estate of the grantor. No relation of landlord and tenant existed. Consequently, when a rent is formally reserved, and the owner seeks to regain possession by an action of ejectment, the first difficulty he encounters is to show that he has got title. He will find the task two-fold; first, to divest the grantor; and second, to invest himself. There is therefore no analogy between actions founded on grants at common law, and grants under the statute. In the one case the plaintiff is the owner, and only seeks to resume possession of his own; in the other, he is a stranger to the

land, and trying to acquire both title and possession of a defendant who has both. The two cases present questions of a different character, and involve entirely different principles.

V. The grant in each of these cases passed the entire estate of the grantor. He had no property of any kind or character left in the premises. He had nothing, therefore, which could descend to his heirs, or which he could devise or convey, along with which the covenants and conditions could follow as incidents. The plaintiffs therefore have got no estate in the land by the alleged devise or assignments. (*De Peyster* v. *Michael*, 2 *Selden*, 467.) As to the effect of the statute of *quia emptores* and our statutes concerning escheats and tenures, and the authorities thereon, above submitted, we insist on the points in the case of Van Rensselaer against Smith.

VI. The grantee took the absolute property in the premises, under the grant in question. His estate was as ample and as independent as any one can hold. His assignee or grantee had as absolute a property as he had, and could not therefore be deprived thereof without due process of law. Now when or by what process had he been divested of his property? As to what is meant by due process of law, see *The People* v. *Toynbee*, (3 *Kernan*, 378.) No one questions the rule of that case, however parties may differ as to its application. And are not the rights of property in land as sacred as those in intoxicating liquors?

VII. It has sometimes been said of grants of this kind, that they were conditional fees; some have called them qualified, base, or determinable fees. They are, however, neither. A qualified fee is an estate granted to a man and the heirs of his body; or as long as a tree, or a steeple may stand, or to be determined by any other contingent event. A conditional fee is one which restrains the fee to some particular heirs exclusive of others, as to the heirs of a man's body, or to the heirs male of his body. In either class of cases when the event happened, or failed to happen, the lands reverted to the grantor. (*See* 4 *Kent's Com.* 9 *et seq.*; 2 *Black. Com.* 109 *et seq.*) We·

have no such fees in this state, and Chancellor Kent thought them abolished. (4 *Kent's Com.* 15.)

VIII. Grants in fee under the statute of *quia emptores,* are not, and cannot be made, estates upon condition. When the owner parts with his entire property, he has lost all power to annex conditions which may control its future use and enjoyment. Any thing of that kind is repugnant to the grant, and therefore void. Conditions cannot be annexed to an estate whereby it may be enlarged or destroyed, except as between landlord and tenant. There must be tenure between the parties. The authorities are numerous and conclusive. (1.) Estates upon condition are classed by all the law writers within that relation. (*See* 4 *Kent,* 120, *and authorities passim.*) (2.) All the authorities agree that a condition and a power of re-entry can only be reserved to the lessor and his heirs, and not to a stranger, even by express words. (*See Taylor's Land. and Ten.* § 293, *and authorities generally.*) By a stranger is meant one who has no estate in the premises. When a grantor parts with his entire estate, he becomes a stranger; and if the mere making a condition in favor of a party vests an estate in him, it might as well be made in favor of any other party as the lessor. If a condition vests a party with any right or estate in lands, there is no such thing as reserving or creating a condition in favor of a stranger, for the condition itself introduces him to the premises. (3.) At common law, conditions are said to descend to heirs, and by statute to pass to grantees of reversions. How, except as incidents of some estate of the party in whose favor they are annexed? If he has no reversion, or no estate, he has nothing to descend or assign with which the condition can pass as an incident. (4.) The doctrine of estates upon condition is of feudal extraction, and resulted from the obligations arising out of the feudal relation. (4 *Kent's Com.* 122.) Under the feudal law they could be attached to every fee. It was that peculiarity which made the feudal polity the medium of oppression, and led to its abolition by the statute of *quia emptores.* If it be true that

conditions can be attached as well without tenure as with, then the feudal system has been unjustly charged with that oppressive feature; then the statute of *quia emptores* was an idle ceremony. But the idea of imposing feudal burdens without the system is of very recent origin. The early authorities are uniformly the other way, and most of the recent ones, wherever the point has been discussed. To enable a reversioner to avail himself of a forfeiture, it is necessary he should have the same estate in the lands at the time of the breach that existed when the condition was created; for an extinguishment of the estate in reversion, in respect of which the condition was made, will extinguish the condition also. As where a lease was made for a hundred years, and the lessee made an underlease for twenty years, rendering rent, with a clause of re-entry, and afterwards the original lessor granted the reversion in fee, and the grantee purchased the reversion of the term, it was held that the grantee should not have either the rent or the power of re-entry, for the reversion of the term to which they were incident was extinguished in the reversion in fee. (*Taylor's Land. and Ten.* § 294.) He cites *Dumpor's case*, (4 *Co.* 120; (*Matthews* v. *Smart*, (12 *East*, 444;) *Their* v. *Barton*, (*Moore*, 94;) *Webb* v. *Russell*, (3 *T. R.* 393;) *Co. Litt.* § 347, 214 *a*. These authorities fully sustain his proposition. An estate in fee simple is absolute and indeterminable; for when lands are granted to a man and his heirs he has such a pure and absolute estate as can never determine, and nothing can abridge or defeat the fee. A fee simple being the entire and absolute property in the land, whenever a person grants away an estate in fee simple, he cannot make any further disposition of it, because he has already granted the whole, so that nothing remains in him. (*Crabb on Real Property*, § 950.) Fee simple is a pure inheritance, clear of any qualification or condition, and it gives a right of succession to all the heirs generally. (4 *Kent's Com.* 4.) The word condition has, in our law, a much more contracted meaning than it has in the civil law. (*Butler's note, Co. Litt.* 201 *a*.)

X. The plaintiffs first ask to recover under the statute which provides an action of ejectment, whenever any half year's rent or more shall be in arrear from any tenant, to his landlord, and no sufficient distress can be found on the premises, to satisfy the rent. (2 *R. S.* 505, § 30.) That statute only applies where the *conventional relation of landlord and tenant exists;* which is not this case. The indenture upon which this action is founded was a conveyance in fee on the 8th of November, 1790. This left no estate or interest in the grantor, and of course created no such relation as landlord and tenant. (*De Peyster* v. *Michael*, 2 *Selden*, 467. 1 *Smith's Leading Cases*, 129, 132, *4th Am. ed. Rawle on Covenants for Title,* *ch.* 8, *p.* 340.)

XI. Were it otherwise, the statute of 1846, abolishing distress for rent, excused the defendant from fulfilling the condition of keeping upon the premises sufficient distress to satisfy the rent, and therefore in effect repealed the statute, which gives an action for the non-fulfillment of that condition. (*Van Rensselaer* v. *Snyder*, 3 *Kernan*, 299.)

XII. But were it otherwise, and had a forfeiture actually occurred, the plaintiffs waived it by subsequently serving their fifteen days' notice. That notice acknowledged a subsisting tenancy subsequent thereto, which thereby waived all previous forfeitures. In *Jackson* v. *Sheldon*, (5 *Cowen*, 448,) distraining for rent, though failing to realize the amount, was held to waive the forfeiture and defeat an action of ejectment. At page 454, Woodworth, J., says, " the forfeiture will be waived if the landlord do any act after the forfeiture, which amounts to an acknowledgment of a subsisting tenancy."

XIII. The plaintiffs also rely upon the statute of 1846, above referred to, providing for a re-entry in certain cases. This statute neither gives, nor pretends to give, an action of ejectment. It merely provides that " whenever the right of *re-entry* is reserved" in certain leases, " such *re-entry* may be made at any time," provided " fifteen days' previous notice" be given, " notwithstanding there may be a sufficiency of

.goods." (1.) The term "re-entry" is all one with "entry;" (*Litt.* § 347;) and in common law usage is not the same as "ejectment." Entry or re-entry was an actual and formal entry upon the premises. The effect where the right existed was to re-invest the possession in the claimant and divest the tenant of the right of possession. Ejectment was an action brought to recover possession of the lands, with damages and costs for the wrongful withholding. (*See Burrill's Law Dic. tit. Re-entry and Ejectment;* 3 *Black. Com.* 201, 2; *Steph. Nisi Prius,* 1394, 1395; 2 *Greenl. Ev.* 310, 11; *Jackson* v. *Sheldon,* 5 *Cowen,* 451.) In this last case, counsel seemed to have conceded that the distinction between a common law re-entry, and a statute re-entry, was that the tenant's estate was gone as soon as the former was made; while in the latter it was not, until after the trial; clearly showing that re-entry in any form was understood to be a very different thing from ejectment. (*See pages* 451 *and* 452.) (2.) Our statutes use the same terms, with the same views of their meaning. 2 *R. S.* 505, § 30, does not waive the actual and formal re-entry sometimes required by the common law, but prescribes what shall stand instead of, or be that re-entry, to wit: the service of a declaration. 1 *R. L.* 440, § 23, made a similar provision, the same in effect, though in different words. The code, § 80, recognizes the actual entry. It is the same as 2 *R. S.* 293, § 7. (*See also* 1 *R. L. p.* 185, § 3.) (3.) The phraseology of the statute clearly shows that the legislature, in the third section of the act of 1846, did not contemplate, nor intend, in the use of the word "re-entry," to provide a new action of ejectment. They used the word twice in the same section, and evidently with the same meaning. They only extended the section to leases in which the right of re-entry is reserved on default of sufficiency of goods and chattels, whereon to distrain, and then only for "*such re-entry.*" Now if they meant by this a new action of ejectment, then it applies only to cases where that action is expressly provided for in the lease, which is not the case in this indenture.

Van Rensselaer *v.* Smith.

XIV. The statute of 1846, known as the fifteen days' notice law, applies only to cases of landlord and tenant. It is so classified in the *4th ed. of the 2d R. S., p.* 751, and the compilers of that edition have appended a note saying: "This section provides the relief which was furnished by § 30 revised statutes," in that edition *numbered* sec. 1, at p. 750. The statute of 1846 never was intended for cases like this. The right of distress, as a remedy, did not exist here before that statute. The provisions of these contracts would only allow of a common law distress. No such remedy was in force here. (1 *R. S.* 747, § 18. 2 *id.* 504, § 24. *Valentine* v. *Jackson,* 9 *Wend.* 302.) In any view of the act of 1846, the plaintiff has not brought himself within its provisions. (1.) Before he can obtain a right to re-enter under that act, "15 days' previous notice of such intention to re-enter" must be given "to the *grantee or lessee, his heirs, executors, administrators or assigns.*" He has alleged no such fact. It appears that the notice was served on the defendant December 8th, 1853. But it is nowhere alleged that the defendant held either of those positions. It is merely alleged that he was in possession of the premises described. The act makes no provision for serving on the party in possession. (2.) It appears that the notice was not served until after the rents became due. The intention of the act clearly was, that it was to be served fifteen days previous to the time prescribed in the lease, when the rent was to fall due. The phraseology admits of no other construction. It is first provided that "such re-entry may be made at *any time* after default in the payment of such rent." This could not be, if it were necessary to have the notice served afterwards; there would be an exception of at least fifteen days. Again, this right is not absolute, but qualified with a proviso, "provided fifteen days' *previous* notice of such intention to re-enter be given." *Previous* to what time? If it means previous to the expiration of the fifteen days, then the word *previous* has no effect beyond appearing somewhat absurd. The proviso would be the same without the word.

The term "provided," with another construction, would be an unusual word. It would be more in accordance with usage to have said "after" or "upon" fifteen days' notice. *Again,* the notice itself indicates such an intention. It is not a notice that a certain amount of rent is due, and if not paid there will be a re-entry; but only of an intention to re-enter, provided default be made. The circumstances which led to that section favor such a construction. The act abolishes distress for rent. It consequently relieved the tenant from keeping sufficient distress on the premises to meet the rent; indeed made it impossible for him to do so. So thought the legislature, and so the court of appeals have decided in *Van Rensselaer* v. *Snyder.* Another consequence followed from that, that the landlord lost his right of re-entry provided for, for want of sufficient distress; and in place of that, the legislature declared he might have a right of re-entry, upon default of payment, but to get such a right he must express his intention to avail himself of it, fifteen days previous to the time the rent became due, as a warning to the tenant.

XV. If the plaintiffs had any estate in the premises, it has vested in them by the failure to pay rent at some time, either when it fell due or some time after due. In *Van Rensselaer* v. *Jewett,* Mr. Justice Jewett says: "It should be remembered that the remedy by ejectment to enforce the payment of a rent reserved, is never allowed only where a right of re-entry is expressly stipulated for between the parties to the grant." (2 *Comst.* 148.) Now, in this case, the plaintiffs have not alleged any estate in themselves, or any divestment of the estate of the grantee, or his heirs or assigns. And they have equally failed to show a forfeiture of the estate, or any facts from which a forfeiture could be made out. (1.) No entry was stipulated for between the parties to the grant for failure to pay rent: it was for failure to have upon the premises at a certain specified time sufficient distress. True, it is alleged in immediate connection with such provision, that there was a further condition for re-entry for non-performance of either of

Van Rensselaer *v.* Smith.

the covenants. But this does not include non-payment of rent. In 1 *Smith's Leading Cases, 4th Am. ed.* 95, it is said, after discussing the authorities upon the subject, that "When, therefore, a right of re-entry is reserved, in case of the non-existence of a sufficient distress, or the non-performance of any of the covenants or conditions of the lease, the clause will be read conjunctively, and an entry cannot be made unless a sufficient distress is wanting." The case of *Van Rensselaer* v. *Jewett*, just cited, does not hold the contrary, but only that it was not at the end of twenty-eight days that demand of rent must be made, but when it became due, if at any time. (2.) In any view, no forfeiture was then incurred, at any of the periods when it is claimed that rent became due. No such thing is alleged, and no demand, or any other requisite to incur a forfeiture. (3.) No forfeiture was incurred by non-payment at the end of the fifteen days' notice. If it is to be the construction of that statute, that the notice could be served after the rent became due, and non-compliance work a forfeiture and loss of a man's land, the statute is liable to the objection, that it deprives a man of his property without due process of law; indeed without any at all. It is not within the power of the legislature to make a law by which one party can divest another of his property and invest himself with it, by merely giving him a notice that he intends to do so. At least it seems to be the law, that such kind of property as was included by the prohibitory law, was safe from a much more formal proceeding; and it is not to be supposed that men are to hold their farms by a less secure tenure than others do their liquor.

XVI. The covenant, the non-fulfillment of which the plaintiffs claim is a violation of the condition, was a personal one and not attached to the land, because (1.) It did not concern the land, for it did not affect the land itself during the term. It was a covenant to pay a certain sum, not for the use of the land, but for the absolute ownership of the property. It had nothing to do with the land, any more than the ordinary cove-

nant to pay purchase money in a definite, instead of an indefinite number of installments, and it certainly did not affect the value of the land at the end of the term. In the case of the *Mayor of Congleton* v. *Patterson*, (10 *East*, 129,) it was held that both these, or one at least, of these effects must follow, to make a covenant run with the land. In that case, it is said, "suppose a covenant by the lessee to make a communication by water from the demised premises through others' lands to another place, to facilitate access to market, the value of the reversion would be materially affected by the performance, but it could not bind the assignee, because all the cases show that the assignee is not bound, unless the thing to be done is upon the land." (2.) There was no privity of estate between the parties. The grantee became the absolute owner of the lands; not only the right of possession, but the right to the soil was blended in him.

XVII. The covenant being collateral, and not attached to the land, and there being no privity of estate or tenure to which it could be attached, the condition could not be operative, if there were one in the deed. (*Smith's Leading Cases, p.* 97.) It would be "repugnant to the nature of the estate granted, and infringe upon the essential enjoyment and independent rights of property, and tend manifestly to public inconvenience," and could not therefore be sustained. (4 *Kent*, 130.)

XVIII. The plaintiffs claim as assignees of the rent and estate of the covenantee. There is no allegation that the condition was assigned, and if they have it at all it must be because it has come to them as an incident of some estate in the land. It is impossible that it could have come in that way, because 1st. There was no estate in the grantor or covenantee to which it could attach as an incident. 2d. Such a condition is not assignable. This may be considered settled in this state by the case of *Nicoll* v. *N. Y. & E. R. R. Co.*, (2 *Kern.* 121.)

XIX. The only question is whether a different rule applies to grants in fee reserving rents than to such grants not reserv-

ing rents. If there is such difference it has been created by 1 *R. S.* § 23. Bearing in mind that the reason of the common law rule was, that neither the condition before breach, nor the right of re-entry afterwards, were assignable, the question occurs, was it the intention of the statute to change that rule? In *Van Rensselaer* v. *Hayes,* (5 *Denio,* 477,) the personal representatives of the lessor sought to recover possession under the same statute, and on the construction that they were expressly provided with the same remedies as the grantor had. Held, they could not, because they had not the reversion. That the meaning of that section (23) went no farther than to give an action to the grantee of the reversion. The same view is taken of the same act in *Harbeck* v. *Sylvester,* (13 *Wend.* 608.) That is obviously the true construction of the statute, not that it authorizes the assignment of any estate, or right of action, which was before not assignable, but simply authorizes grantees of reversions to maintain such actions as may pass as incidents to the reversion. This is the construction put upon 32 *Henry* 8, *ch.* 34, of which our act is only a transcript, in effect. It was not in England held that that statute made any thing assignable that was not before assignable; and with that view, in 1844 (7 *and* 8 *Victoria, ch.* 76, § 5,) an act was passed, the 5th section of which authorized any person to convey by deed, among other things, the "right of entry, for condition broken." In 1845 (8 *and* 9 *Victoria, ch.* 106,) that section was repealed, and another, the 6th, substituted, which provided, among other things, that "a right of entry, whether immediate or future, and whether vested or contingent into or upon any tenement or hereditament, &c. may be disposed of by deed." In *Hunt* v. *Remnant,* (24 *Eng. Law and Eq. Rep.* 545,) which was an action of ejectment by plaintiff as the grantee of a reversion, for the breach of a condition in a lease, the court held, that under the last statute the right of entry for condition broken was not assignable, but only a right of entry at the end of an estate; and this decis-

ion was made, notwithstanding 32 *Henry* 8, but also of 8 *and* 9 *Victoria.*

XX. The complaint in each case contains but one count, and sets forth two pretended causes of action, one under the act providing ejectment for want of sufficient distress, and the other under the act of 1846. This is made cause of demurrer. (*Van Santvoord's Pl. 2d ed. p. 346 et seq. and authorities there cited.*)

*W. A. Beach,* for the respondents, (plaintiffs.) *First,* in behalf of the plaintiffs in the first and second suits. I. The covenant to pay rent followed the land. The defendant claiming and holding under the lease, is liable, as assignee, for the rent. (*Main* v. *Feathers,* 21 *Barb.* 646. *Post* v. *Kearney,* 2 *Comst.* 394.)

II. It was not necessary to make the assignees and holders of the other portions of the land parties. They had no interest whatever in the apportionment of the rent against these defendants. They hold in severalty, and are liable according to the *value,* not the *quantity,* of their possession. Their rights cannot be compromised by the judgment here. (*Van Rensselaer* v. *Bradley,* 3 *Denio,* 135. *Same* v. *Gallup,* 5 *id* 454. *Same* v. *Jones,* 2 *Barb.* 643. *Astor* v. *Miller,* 2 *Paige,* 68.) Upon the same principle, when the interest of the lessor descends to several heirs, the latter may separately bring actions for their several proportions of rent. (*Cole* v. *Patterson,* 25 *Wend.* 456.) So, also, an assignee of an undivided moiety of leasehold premises, can maintain an action in his own name, for a breach of warranty in the lease. (*Van Horne* v. *Crain,* 1 *Paige,* 455.)

III. The defendants not being named in the lease, and being found in possession of the demised premises, are presumed to be in as assignees of the lessees. (*Acker* v. *Witherell,* 4 *Hill,* 112.)

Van Rensselaer v. Smith.

*Second*, in behalf of the plaintiff in the third suit. I. The plaintiff's action is sustained, if the admissions and proof show a grant reserving rent with condition for *re-entry*, in case of insufficiency of distress, a default in payment, and a notice of fifteen days, of the intention to re-enter. These are all the requisitions of the statute of May 3, 1846.

II. The act of 1846 abolishes the right of distress in this case, and, instead thereof, gives a *new remedy* for the rent. (*Van Rensselaer* v. *Snyder,* 3 *Kernan,* 300.)

III. The new remedy is founded upon the statute, and the *default* in payment of the rent, and not on any forfeiture of the estate, for no forfeiture is necessary, by the terms of the act. (3 *Kern.* 300.)

IV. The re-entry given by this act is given in place of the remedy by distress, which was abolished by the same law, and the substituted remedy should therefore be made equivalent to the old one, as far as the parties interested are concerned. By the common law and statute, and by the agreement in the indenture, the grantor had the right to *distrain*. This was his remedy to recover rent which he perhaps could not otherwise collect; as where there were several occupants, whose rights could not be ascertained with sufficient certainty to warrant actions of covenant; or where an action of covenant would be ineffectual, in the event of the insolvency of the parties; or where the tenants frequently changed, leaving different persons liable in covenant for small amounts; or where, as in this case, the parties fraudulently evade the inquiries of the landlord to obtain information, and his efforts to serve legal process in ordinary actions. In all these cases, *distress* was the reliable remedy, for, " if rent charge issue out of lands in possession of many tenants, a distress may be taken upon any part of the premises for the whole rent," (*Taylor's Landlord and Tenant,* 241; *Comyn's Dig. tit. Rent, A;* 2 *R. S.* 2*d ed.* 436, § 41,) and the distress may be for all the rent in arrear. (*Wells* v. *Porter,* 7 *Wend.* 119. *Braithwaite* v. *Crooksey,* 1 *H. Bl.* 465. *Taylor's Landlord and Ten.* 246.

4 *McCord*, 496.) This remedy, which was summary, and exposed the property of strangers, the legislature have seen fit to abolish, and perhaps with more justice, have considered that the land out of every part of which the whole rent issues, should be proceeded against directly.

V. The substituted remedy should, if possible, be made effectual in all cases, and to the same extent as the remedy abolished.

VI. The only question, upon the pleadings and proof in this case is, whether the plaintiff is entitled to recover the land, if the defendant persists in fighting and refusing to do equity. While he denies his liability and maintains his hostility to the plaintiff's rights, the court cannot, and should not, exercise its equity power for his relief; and it is of no consequence as to the exact amount of rent which is due, nor who should, in equity, pay it.

VII. There can be no doubt of the ability and duty of the court, at any time before writ of possession executed, to stay proceedings, upon payment of the rent and costs. This has been done, from the earliest times, by courts of law as well as equity, and when the defendant is willing to do equity, the court will assist him, and, if necessary, order a reference to ascertain the amount of rent to be paid, if the parties do not agree. (*Strange*, 900. 2 *Sellon's Pr.* 127. 2 *Salk.* 597, *and cases cited. And see also* 1 *Paige*, 414; 7 *id.* 352; 16 *Ves.* 402; 18 *id.* 56; 19 *id.* 134; 2 *Price*, 200; 2 *Mer.* 459.)

VIII. The plaintiff's action of ejectment must be against the party in the actual possession, and he can recover only such part as each defendant, who is sued separately, severally occupies. Perhaps, in these peculiar cases, it will promote justice and diminish litigation, if the court finds the ability, under the code, to *permit* the joinder of occupants of parcels in severalty as defendants, so as to recover the whole lot in one action; but the court never should drive the rent owner to do this, for it will involve him in litigations in which he has neither interest nor duty, and which will arise out of the disputes, agreements, frauds and conflicting claims

of those who have divided the land among themselves, and who together owe the whole rent and should pay it, and then settle their own differences. Neither the plaintiff nor this action ought to be unnecessarily incumbered with the settlement of such questions.

IX. If part of a lot only is recovered, and the owner is *compelled*, as he should be, to pay all the rent to redeem it, he has remedy, both at law and in equity, to compel contribution from the owners of other portions. (*Wells* v. *Porter*, 7 *Wend.* 119. *Hunt* v. *Amidon*, 4 *Hill*, 345. *Peck* v. *Ingersoll*, 3 *Selden*, 528. *Shaw* v. *Woodcock*, 7 *B. & C.* 84. *Sapsford* v. *Fletcher*, 4 *T. R.* 511.)

X. The rent owner has no guide to the ownership, except the occupancy, and if the occupants, and perhaps their neighbors, are adversary and unwilling to tell any thing but falsehoods, he has no means of knowing who has the legal title, nor, with certainty, even the boundaries of the respective occupants; and no one occupant can complain that he is the first one sued, especially if, like the defendant, he has fraudulently, by evasion, concealment and falsehoods, endeavored to defeat, delay and obstruct the landlord and the law. All the occupants, when they divided, knew the liability of their portions for the whole rent, and if they confederate to cheat, rather than to promote justice, no one of them can complain, even if when he seeks contribution, the others combine if possible to cheat him.

XI. No actual formal entry has been required to found an ejectment, for the last 150 years. (1 *John. Cas.* 126. 2 *M. & S.* 525. 2 *Ld. Ray.* 750. 7 *Watts*, 149. 2 *R. S.* 2d. ed. 233, §§ 25, 26.)

XII. The 3d section of the act of 1846, in terms applies to *grants*, as well as leases—both are mentioned; and if any doubt existed, it is cleared by the provision for serving the notice upon the *heirs* of the *grantee;* for the heirs could not be possibly interested in a term for years which goes to executors, nor in any grant of any estate less than a fee.

XIII. The notice was served in the manner required by the statute, which does not require a personal service; and the service is admitted by the pleadings.

XIV. The act of 1846 is intended as an ameliorating remedial act. It neither creates nor proceeds upon any forfeiture; and, if necessary, should be construed liberally, to carry out its purposes. It takes away the landlord's distress, and it gives the tenant fifteen days' notice of an intention to re-enter, instead of the sundown warning and absolute forfeiture, under the common law demand.

*Third,* in behalf of the plaintiffs in the fourth suit. I. The first ground of demurrer is clearly erroneous. The original lessee, having parted with his title, surely is not a proper party, nor is any intermediate assignee. The defendant is in possession, *claiming title* from the original lessee, under the indenture upon which the plaintiffs sue. Nobody but himself can be party defendant. Even though others, out of possession, claimed title, they would not be necessary, though admissible parties. (*Van Buren* v. *Cockburn*, 14 *Barb.* 118. *Fosgate* v. *Herkimer Man. &c. Co.*, 12 *Barb.* 352.)

II. The second ground of demurrer is equally fallacious. By the act of 1846, (*Laws of* 1846, *p.* 369,) no re-entry for rent in arrear can be had on account of insufficiency of distress. The remedy by distress is abolished. Right of re-entry, by the terms of the lease, rent in arrear, and notice under the act, are the elements of the action. The allegation of no sufficient distress, furnishes no cause of action. It is surplusage. Were it otherwise, it was still perfectly proper, in the same count, to assign different breaches, through which our right of re-entry accrued. The cause of action is one. It is to recover possession for the breach of the several covenants and conditions nominated in the lease.

III. The remaining causes of demurrer are answered in the points presented, in *Van Rensselaer* v. *Smith.*

---

Van Rensselaer v. Smith.

---

Gould, J.   Although two of the cases above entitled are for the recovery of the *rent* arrears, and the other two are in *ejectment*, for the recovery of the lands, yet so many of the grounds taken for the defense are common to the two classes of suits, that it is perhaps as well to embrace all the points of the different defendants in one opinion; and thereafter, give the decision in each case, severally, by applying to it so much of the opinion as is appropriate thereto.   And as we know by the great number of such suits upon our calendars, the real importance of a decision in any one; and are by the grounds assumed in the various arguments, fully informed that a discovery has been made in the law of this state; and that a simple reference to the older English authorities, (though under a law that will be found to be radically different from ours, and based on reasons which here either never existed or have ceased to exist,) will suffice to overturn the unadvised decisions of our own courts; there seems to be a necessity for, certainly a propriety in, going more at length into the discussion of those reasons, and of some, at least, of those authorities than accords with either my wishes or my practice.

To commence with a definition.   We are told in argument, that a *rent charge* cannot exist upon a term *for life*, or *years*, or *any other limited term*, (citing *Littleton*, § 217;) but in *Littleton's* next section (§ 218) we find him saying "if a man grant a yearly rent, to be issuing out of his land, to another in fee, or in *fee-tail, or for term of life* &c., with a clause of distress, &c., then *this is a rent charge.*"   The truth is, that Littleton defines *two kinds* of rent charge; and as the confusion, arising from a failure to note this, (in the earliest cases,) seems to have influenced, or may have influenced, some of the English authorities which are cited to prove that a rent-charge does *not run with the land;* it is likely to be essential to keep *both* kinds in view, in attempting to attain a just appreciation of the *reasons* for such decisions; in order to judge how far those reasons should control us.

Now *before* the statute, known (from the first words of its

preamble) as the statute " *quia emptores terrarum,*" almost any rent or service could be reserved, as well upon a grant in fee, as on one in tail, for life or years, and so reserved it was called a *rent-service;* and the right to distrain for such rent, (or service if reserved, or both,) was by the common law, (or under statutes of so long standing as to be called common law,) incident to the reservation, or grant, *without* any words giving distress, &c. (*Litt.* § 216.) But " by force of the statute of *quia emptores terrarum,* it behoved any man, who would reserve to himself a rent service, that the reversion be in himself; for if he would make a feoffment *in fee, without deed,* reserving to him a certain rent, this reservation is void," (*Litt.* § 215,) because the donor having no reversion, the tenant holds *immediately* of the lord (chief lord.) I would here, however, call attention to what, (so far as either English or American cases have been cited,) I do not find noted : Coke, in his note to this § 215, says, " and it is to be understood, that in case of the gift in tail, lease for life, or years, the *fealty* is an *incident inseparable* to the *reversion,* so as the donor *cannot* grant the reversion over, and save to himself the fealty, or *such like service;* but the *rent he may except;* because the rent, although it be incident to the reversion." (i. e. go with it if *not* separated,) "yet it is *not inseparably* incident." Coke cannot mean that a rent, reserved in a grant in fee-tail, *so excepted,* would be *void;* though what the defendants call the possibility of reverter has been *separated from the rent.* Yet it would seem that the English courts have, in substance, so decided, taking no note of this rule of Coke's.

To return, however to Littleton. Having (in §§ 215, 216,) thus said what, *by force* of said statute, was the effect of a feoffment in fee *without deed;* he proceeds, in § 217, to give the effect—under that statute—of a feoffment *by deed.* " But if a man, by *deed* indented, *at this day,* make, &c. a feoffment in fee, and *by the same indenture* he reserves to him and to *his heirs,* a certain rent, and that if the rent be behind, that it shall be lawful for him and *his heirs* to distrain, &c., such

Van Rensselaer *v.* Smith.

a rent is a *rent charge, because* such *lands are charged* with such distress *by force of the writing only,* and not of common right." And if it be *without* such a clause it is a *rent-seck,* "*for that* he cannot come to have the rent, if it be denied, *by way of distress."* And upon this section Coke notes that "it is a *maxim* in law, *that the rent must be reserved to him from whom the estate in the land moveth,* and not to a stranger." This point also requires to be remembered, in considering the English cases. (*See also Doctor and Student,* 126, 127.) Further see Littleton, § 346, and its note by Coke, for the *express rule* that, on a feoffment *in fee,* a reservation of a *rent* to the *feoffor* and *his heirs* is good.

So far, certainly, both Littleton and Coke would *seem* to say that the grantor and *his heirs*—such rent of course *inheritable*—could, *upon a grant in fee* if made by *deed providing therefor,* hold a rent which they could enforce by distress upon the *land charged;* and this, notwithstanding the statute, *quia emptores.* And they certainly express no *limitation of time,* (or number of successive grantees of the land,) as releasing the *land* from its liability to this distress, but say the grantor *and his heirs*—words universally known to mean, when *not* limited, heirs *forever.*

As all the citations thus far, speak of *reservations* of rent, this seems the more appropriate place for commenting on the position of the defendants, that words of reservation, as "yielding and paying," *never* attach a *condition* to a fee. The case they cite, (*Tallman* v. *Coffin,* 4 *Comst.* 138,) does say so; but it was not necessary to the decision *to say so;* as the same hard result would have been attained, by merely holding that the lessee having failed to protect himself against the legal effect of the ending of his term, (which was that the lessor, *by law,* was entitled, thereupon, to immediate possession,) by not inserting in his lease provisions for the appraisal of, and payment for, his improvements, *at or before* the ending of his term, must abide the consequences of his neglect; and that, granting that, "paying for the improvements" were a

condition, still even a condition could not lengthen the term of letting. Yet I cannot but think that the result of that case would have appeared more just, and would have been more satisfactory even to the court, had a point been strained to bring the case within the authorities cited in support of the decision. For those, *all*, hold that precisely such words *do* make a condition, where, without such a construction, *the party would be without remedy.* In 8 *Cowen*, 296, Chief Justice Savage says, of "repairing," &c. covenant lies for not repairing, and "so similar words *may* amount to a condition, where without such construction the party would be without remedy;" as he would, substantially be, in the case at bar, *if* the express covenants to pay, and the covenants to pay implied on the reservation, are all, as regards the land, void—as the defendants claim—and the grantee took an absolute fee of the land, released from all covenants for rent on the execution of the lease. And the case cited by Judge Savage, (2 *Mod.* 35,) holding—to *prevent* a forfeiture—that an action of covenant lay on similar words, did *not* hold, as cited to have done, what was merely the argument of counsel. Further, it will be seen, by reference to *Littleton*, § 374, and comparing Coke's notes with the text, that a rent reserved by the words of the grantor, is put as coming within Littleton's principle; that although the particular tenant never signed the indenture, "but inasmuch as he entered and agreed to have the lands *by force of the indenture*, he is bound to perform the *conditions within the same indenture*, if he will have the land."

That mere words of rendering do make a covenant—of course liable to be called a condition within the reason above—there are numerous authorities in point. (*Powell on Cont.* 242. 1 *Ventris*, 10. 1 *Bac. Abr.* 530. *Carthew*, 135, 136, 162, 282. 3 *T. R.* 402. 1 *Saund.* 241 *b, note. Also*, 5 *Selden*, 20.) And that this is true, even where the words are used in a deed *poll* by the grantor, see in point, *Co. Litt.* § 217, *note; Cro. Jac.* 240, 399, 522 ; 2 *Mod.* 92. In the case of *Main* v. *Feathers*, (21 *Barb.*) there was but little argument

made; and this point was not distinctly taken by the defense. Therefore that decision touched this point, without going into the particularity of the explanation above, merely to show that sound law—as well as pure morals—forbid a man's receiving the benefit of a particular contract, without coming under the obligation to perform the corresponding duty, expressed in the same contract, and for which the benefit he receives was the sole consideration. This latter foundation for the duty will however be more fully considered hereafter.

If we have thus stated the law, but as it stood prior to, and as altered by the statute, *quia emptores,* it is best—before proceeding to consider the next statute change, as made by the English act concerning grantees of reversions, &c.—to note the original *reason,* why any and all contracts did not, of course, pass according to their tenor, for and against the holders of the subject matter, about which such contracts were made, even where assigns were named therein. "For avoiding maintenance, suppression of right and stirring up of suits; nothing in action, entry, or re-entry, can be granted over." (*Co. Litt.* 214 *a.*) That is, at common law, *no chose in action was assignable.* (*See preamble of Stat.* 32 *Hen.* 8, *ch.* 34, *in* 1 *Saund.* 238, *n.* 2.) So that, though by granting over the reversion, a lessor could give to a grantee of such reversion a right to *distrain* for the rent, (where the grantee could act *in rem,* by himself or bailiff, without the assistance of a suit at law,) yet such grantee could not re-enter and oust the tenant, as the lessor or his heirs might have done. But Littleton wrote before that statute of 32 Henry 8. By that statute such grantee might re-enter, as the lessor in his place might have done. Though it is to be remembered that the statute was, by the courts, construed *not* to extend to gifts *in tail.* (*See Co. Litt.* 215 *a.*)

Under the provisions of this statute, (to be found, sufficiently in detail for most purposes, in 1 *Saunders,* 238, &c.) and the common law as thereby modified, have been had the decisions of the English courts, which are claimed to control

our action. The prominent one, upon the principle involved, is *Spencer's case,* (5 *Coke,* 16, &c.) It was there "resolved" as follows: If a lessee covenant for himself and *assigns to* make a new thing on the demised premises, as the assignee is to take the benefit of it, it shall bind him by the *express words.* But even express words shall not bind him to pay a *merely collateral* sum to the lessor, or to a stranger, *because* it in no manner *touches or concerns* the thing demised, *or* that was assigned over. *Again ;* on a lease for years, of land, with a stock or sum of money, rendering rent ; if the lessee covenant for him and his assigns to deliver the stock or sum at the end of the term, the assignee (of land) shall not be charged with this covenat, as "the rent did not issue out of the stock, but out of the land only ;" and it is not certain that the stock or sum would come to the assignee. *Again ;* if a man makes a lease by this word *concessi or demisi,* which implies a cove-nant, (on lessor's part,) and the assignee of the lessee be evicted, he shall have a writ of covenant against lessor, &c. "For the lessee and his assignee hath the yearly rents and profits of the land, for an annual rent ; therefore it is reasonable, when he hath employed his cost upon the land, and be evicted, (whereby he loses all,) he shall take such benefit of the demise as the first lessee might, and the lessor hath no other prejudice, than his express contract with the first lessee bound him to." *Again ;* (as the reason of one of the resolutions) "reason requires that they who shall take benefit of such covenant when the lessor makes it with the lessee, should on the other side be bound by the like covenant, when the lessee makes it with the lessor." And the substance of the last position in that case is, that the principles there put forth apply to any unlimited succession of assignees, on both sides—lessor and lessee.

The English decisions of later dates are considered or claimed to be founded on, and to have followed, this case ; and while its plain and most satisfactory reasoning clearly covers the case of all rents proper, and would surely fasten *all upon the land,* this very case, reasons and all, is so construed by later element-

ary writers, claiming to be supported by English decisions, (as *Platt on Covenants*, 65, 466, 475, *and* 1 *Smith's Leading Cases, Spencer's case*,) that it, in connection with the statute *quia emptores*, settles the law to be that even a rent, which was *the consideration* of the grant to the lessee—and, as in the cases before us the *only* consideration, therefor—is, as regards the *land* out of which it is reserved, and out of which it is an annual issue, merely void, unless the lessor retain in himself a reversion, or the possibility of a reverter ; and that on a lease in fee he does not retain any such ; and that therefore the lessee, though personally bound by the contract, and having no personal responsibility as the case may well be, as he paid nothing for his lease, may the next day after getting his lease, himself grant a fee absolute of the land ; and thereby put the land itself entirely beyond the reach of the lessor, who has thus received *nothing* for his land. And this, notwithstanding the rent is, by the terms of the indenture, *charged upon the land* by clause of both distress and re-entry ; thus being a rent charge ; and also notwithstanding the indenture by its terms includes the lessee's assigns, as well in the clause of reservation, as in the express covenants. This *may* be law ; it is *not* justice. Nor does it come within Lord Coke's maxim, that "law is the perfection of reason." And it is flatly against *Littleton*, § 217, *and* 346, *note, as above cited.*

The prominent decision, cited by these writers, and almost the only one that names a rent charge as not running with the land, is that of *Brewster* v. *Kidgell*, or *Kichell*, or *Kichin*, spelled variously, which is reported *nine* different times, making a great apparent array of authorities. There are, however, several reasons why it is no authority for the purposes to which it is cited. 1st. The point did not arise in the case, at all, and whatever is said to such purport, is a mere *dictum*. 2d. It is the dictum of but one of four judges ; that one, being indeed, Lord Holt ; but the other three deciding the case. 3d. That was a case of what these defendants say is *not* a rent charge, i. e. where Langford, Kidgell's grantor,

in consideration of £800, money to him paid by Brewster, granted to her and her heirs, &c., ·(who received no land by the grant,) a rent-charge of £40 upon *his* manor of Butler's, with a clause of distress and covenant for further assurance; and by a subsequent deed he made a covenant that the rent, "freed of all taxes," should forever after be duly paid. Subsequently, parliament levied a new tax; and the suit reported was no suit at all, but merely a case made up on a wager that this tax could not be lawfully deducted from the rent. And *that* was the only point in the case; and judgment was for the plaintiff, as against the terre-tenant, (Kidgell, to whom Langford granted the fee, after the rent was so charged,) that *he* must pay the rent without deducting this tax, which he had to pay also. A full report of this case is in *Comberbach,* 424 *and* 466. At the latter page a question is stated, "whether the assignee of the land, in this case, can be charged with the covenant of the grantor, for it is not a covenant that runs with the land, but collateral to it; but judgment was given for the plaintiff upon the first point," as above. The other eight citations of this case are *Holt,* 175, 669; *Carthew,* 438; 1 *Salk.* 198; 2 *id.* 615; 3 *id.* 340; 5 *Mod.* 368; 12 *id.* 160, 171. There can, however, be no objection (so far as the cases before us are concerned) to agreeing with the dictum as far as it goes with the case; which is that where there was *no consideration* (in any way connected with, or growing out of, the *land* or the sale of it,) for charging the land with what was *called* a rent; as for that so-called rent, *it* never could run with the land, although nominally charged upon it.

*Russell* v. *Stokes,* (1 *H. Bl.* 566,) cited as being to the same purport, was decided upon the point that Stokes, (plaintiff in the court below,) though nominally joining in the grant of the land, in which the rent was reserved, *had then no interest in the land,* being but in possession as tenant at will, and a covenant *to him* could have nothing to do with *the land.* Many of the other cases, so cited, will be found to be as foreign to the reasons of Coke. But as, in this state, it is not

(in these cases) absolutely necessary to be sustained by English authorities—for reasons that can, I think, be made apparent—there is no occasion to incumber this case further than to say that there are English decisions which go nearly, and probably quite, the length of saying that no rent charge runs with the land, as well as that there needs must be a reversion in the covenantee, to enable him to sue the covenantor's assigns; though many of the cases, cited as so deciding, are *not* in point, as they are concerning covenants conceded to be collateral, and are plainly *not* on the footing of any covenant to pay *a rent proper.* Such are 3 *Term Reports,* 402; 1 *New Reports,* (or 4 *Bosanquet & Puller,*) 162; 2 *East,* 575; 6 *id.* 304, 5; 10 *id.* 135. And the reasoning of nearly every one of these cases would sustain the covenant as against the assignee, if the covenant were *in, or accompanying, the conveyance of the land.* And if, in connection with such sound reasoning, we find in our own courts decisions enough to give even a *color* of authority, our decisions, according with common sense and common justice, are better for us than foreign decisions against such wholesome grounds of reliance. Especially when we have such good foreign authority as 3 *Term Reports,* 403, for saying that abiding by the English decisions sustains defences " of a most unrighteous and unconscionable nature ;" though there by no means as much so as those in these cases.

In the former decisions of this court, it has not been deemed absolutely indispensable to cite and comment on all the cases that have been decided any where; and barely enough of the principles of the English law has been cited, to show that all reason was on the side of the plaintiffs. Nor was our own law entered into in detail, as there have been enough decisions here, fully to authorize our saying, (without such detail,) that here a rent charge runs with the land. But as the attempt is here made, (on the asserted strength of the older authorities,) to overthrow the basis of all these decisions ; greater particularity and fullness are now indispensable.

Still an accurate examination of the grounds taken by these defendants will, I think, show that even now we need not examine, or follow, all these foreign decisions. And as the defendants' reliance is on the force of the statute *quia emptores*, (they asserting that our statute "concerning tenures," passed February 20, 1787, is the full equivalent of that statute,) which they claim has destroyed all tenure under a lease in fee; and thereby done away with the relation of landlord and tenant, as between the lessor and lessee in such a lease; and, by consequence, has put the lessee in possession of a fee simple absolute—the land discharged from any rent to any body—it is desirable to ascertain what is the state of the law on principle and in justice, without this statute; and then to see if our statute of tenures, engrafted upon and qualified by our other laws, is really equivalent to that statute; or what, if any, is the difference between the two, as to purpose and effect.

As has been already stated, the principle of the common law, which prevented the direct transfer of any contract or covenant, as well in regard to its benefits as its burdens, was that a chose in action was not assignable. To avoid the obvious injustice of this, where covenants entered into the very essence of transfers of estates in lands, the common law permitted a practical evasion of (under the name of an exception to) its rule, in the case of covenants which it construed to be capable of running with the land; by allowing their transfer, not by direct assignment, but as incident to the land, or some estate in it, where that was sold or assigned. And combining the decisions, it may fairly be said that a covenant is so "capable" when it *affects the land*, although not directly to be performed on it, provided it tend to increase or diminish its value in the hands of the holder. Even this was to be qualified, by saying that if there were no such relation between the parties as would, by the feudal law, have created tenure and privity of estate, a covenant should run with the land only for its benefit, and not for its

burden. But this qualification was itself restricted to those cases where the covenant was created by some instrument which did *not* pass the estate to be charged with the burden. Since where the reservations or covenants are *in the very conveyance* by which the covenantor, &c. *acquired his land,* the performance of those covenants, &c. plainly forms part of the consideration, without which the conveyance would not have been made. (*See an able discussion,* 1 *Smith's Lead. Cases,* ed. 1847, *pp.* 135 to 138 ; *ed.* 1855, *p.* 181, *&c.*) And whenever (as in some states) there is no statute of *quia emptores,* or its equivalent, in force, a conveyance in fee, with covenants, &c. for rent creates privity of estate ; and proper covenants in that conveyance (of which to pay rent, &c. is always one) run with the land. And an English case (3 *Wilson,* 26) has well held that covenants are, at common law, as well capable of running with incorporeal hereditaments as with land ; and a rent is at least an incorporeal hereditament. (*See* 1 *Smith's Lead. Cases,* ed. 1847, *p.* 116, *&c.*) And in this state, by statute, (1 *R. S. 1st ed.* 750, § 10,) "hereditaments" of any kind are within the term "lands," in all our statutes relating to tenure, assignability of covenants, &c., while in *De Peyster* v. *Michael,* (2 *Selden,* 506,) the court of appeals hold that, under these leases in fee, "the grantor owns the rent and the grantee owns the land. Each has an estate of inheritance in his own part," (meaning his part of the one whole fee simple absolute in the land.)

When the statute *quia emptores* was passed in England, (intended for the benefit of the chief lord, not of the tenant,) the policy of that law was held to be, to discourage all relations between the grantor of land and the grantee, which could in any way impair or restrain the estate granted to the latter ; and consequently that policy called the covenants of the grantee, (no matter how absolutely of the very essence of the conveyance,) personal, and not binding the land in the hands of its assignee. But since the reasons assigned for this policy were, to prevent sub-infeudations, (for the benefit

of the chief lord;) and for the benefit of the *assignee*, to protect him from the burden of a covenant or condition to which he did *not consent*, and for which *he received no consideration;* and of which, indeed, he was, or might be, entirely ignorant, until actually evicted for a forfeiture, or sued on the covenant; and since those reasons, practically or in fact, never existed in this state, (*see as to feuds, Revisers' Reports, part* 2, *ch.* 1,) the maxim " *cessante ratione, cessat et ipsa lex,*" is completely applicable. And as the absolute rule that choses in action are not assignable, has been much modified, that also, has measurably ceased to afford a foundation for the rule. Therefore, it would seem untirely reasonable to resort to the old test, of whether the covenant *has been accompanied by a conveyance.* If it has, it would be only fair that the *assignee* should continue to perform that which must be seen to have been part of *the price of his land,* (in the cases at bar the *only* price,) and without which this very land would not have been transmitted from the covenantee (original grantor) through the lessee or grantee to the assignee himself. The land which he holds is the consideration he has received for his contract, or burden. Where there is no such accompanying conveyance, the consideration of the covenant is necessarily foreign to the land; and the *title* of the covenantor is independent of the stipulations of the covenant; and as these relations, and all other relations which are indicated by the technical phrase, " privity of estate," are absent; there is no reason why the assignee should be bound by the covenant. But when there is such accompanying conveyance, no future party has a right to complain of any lawful burden attendant upon it, whether of covenant or condition; since, *independent of the conveyance, neither estate nor burden could ever have reached him.* (1 *Smith's Lead. Cases, ed.* 1855, *pp.* 181 *to* 183.) But what are *our* statutes which are claimed to be equivalent to the statute *quia emptores,* since that statute itself never existed here. First, that of 20th of February, 1787, " concerning tenures,"

(1 *Revised Laws*, 70,) and before this what was our law of tenures. Under the Dutch government *no feudal tenures* were known. And by the first grant to the Duke of York, from Charles 2, dated 12th March, 1664, confirmed by patent, 1674, all lands were to be held in free and common socage; so that (as feudal tenures never existed here) a great part of that statute of 1787 was merely unnecessary. So far as it takes away particular incidents of *socage* tenure, it is operative; while its 5th section, entirely and by absolute exception, saves out of its operation all then existing "rents certain, or other services incident to tenure in common socage," due or to grow due to any one; and also, "the fealty and distress incident thereunto." The revisers, who embodied our laws in the revised statutes, had this act expressly repealed, (3 *R. S.* 1*st ed.* 129,) and put in lieu of it sections 2, 3 and 4, 1 *R. S.* 1*st ed.* 718, which remain unaltered, and are our present law. The revisers, in reporting this last act to the legislature which passed it, say: "Deeming it important that all lands in this state should be held upon a uniform tenure, *and still more so, that all lands should be subject to the rents and services which have heretofore obtained among our citizens, and the rights annexed thereto by the common law*, the revisers, in section 3, have made all lands allodial, and in section 4 have expressly subjected them to those incidents of the socage tenure." (*See Revisers' Reports, part 2, ch.* 1.) And that legislature passed those sections just as reported, with this accompanying construction before them, which is fully equivalent to a preamble.

This section 4 is very important in the case, (and though its number is given on the points, no attention was paid to it,) for the act of February, 1787, being repealed, this section leaves all lands, in the revisers' words just cited, "subject to the rents and services which have heretofore obtained, &c. and to the rights annexed thereto by the *common law*," (not by the statute *quia emptores*,) and extends this provision, so that it reaches not merely then existing rents, &c. but

" any rents or services certain, which at any time heretofore have been, or hereafter may be, created or reserved." So that whatever might have been the effect of the statute of 1787, on leases made between its passage and 1830, (when the revised statutes took effect,) in cases during that time tried, there is now no effect of that statute, touching any conveyance whatever.(*a*)

Entirely freed, then, from the statute *quia emptores,* we turn to Littleton, § 216, for " the rights annexed by the *common law* " to such " rents and services " as are in these leases contained, and we find that " if a man make a feoffment in *fee simple* by deed, *yielding* to him and to his heirs a certain rent, this is a rent service, and for this he may distrain of *common right.*" And Coke's note to this section is, that upon such a feoffment in fee, (even without deed, in his time,) the feoffor might, at common law, have reserved a rent to him, and to his heirs, " because it was a rent service, and a tenure was created." And that such rent service was an *incident of the socage tenure,* (one of " *those* incidents of the socage tenure," to which, as above, the revisers " have *expressly subjected all lands* " in this state.) (*See* 2 *Bl.* 79, 80 ; *Jacob's Law Dic.* " *socage ;*" *and Coke Lit.* 86, *a.*) " The legal termination *agium,*" (as in *socagium,*) " in composition signifieth *service, or duty.*" Whether such rents and services as are reserved in the leases before us, be in law and in fact such " as have heretofore obtained among our citizens," will more fully appear hereafter.

In the mean time, before leaving this statute, it should be observed that, in this 4th section, the words " take away or discharge " must have the legal effect of " not impair," or to leave entire and unaffected ; and will fully bear the construction that the lands are subject to (that those " rents and serv-

(*a*) Applying to these provisions the principles, (as to *retroaction,*) in the *note* on the statute of 1805, (*post, p* 154,) *all these leases are excepted out of* the statute *concerning tenures;* and this conclusion (in the text) becomes unavoidable.

ices" carry with them) the *rights* annexed thereto by the *common law;* one of which is the right to the benefit of the tenure which is thereby created.

Next, of *our* law, as to the *assignability* of such, or any, covenants or conditions. Since the statute, 32 Henry 8, ch. 34, (like that of *quia emptores,*) had no existence here, we must resort to a statute passed in 1788, which was like the one of Henry 8, and enabled grantees of reversions to take advantage of conditions and covenants in leases. (1 *R. L.* 363.) That statute made the covenant, as a contract, assignable; and such assignment carried with it the "*very privity of contract,*" which would continue, *after* the reversion had been assigned over, to enforce a remedy for breach accruing during the holding of the reversion. (*See in point, Carthew,* 289 ;(*b*) 1 *Saund.* 241, *a, b.*) Our statute, as found in 1 *R. L.* 363, 4, is, however, *not* the statute of 1788, which is to be found in the compiled laws of Kent & Radcliff, vol. 1, p. 105, where the act consists of merely sections 1 and 2 of the act as printed in the revised laws of 1813. Section 3, is, however, of the last consequence, in the cases before us.

That section was enacted by itself, in 1805. (*See ch.* 98, *Laws of Sess.* 28, *in 4th vol. of Webster & Skinner's Session*

---

(*b*) The case in Carthew is this: A. made a lease for lives to B., reserving a yearly rent to A. and his heirs. A. then devised the reversion to C. and died. C. held the reversion two years, and then granted over the reversion to D. After having so granted over, C. sued B. in covenant, for the two years' rent which accrued while he (C.) held the reversion. It was urged in bar, that C. not holding the reversion at the time of suit could not maintain the action. But the court held the action well lay ; Lord Holt saying that (by the statute, 32 Henry 8) "the very privity of contract" was transferred by and with the devise of the reversion, (i. e. privity of contract as distinguished and distinct from the privity of estate.) So that, by that statute, a chose in action as separable from the reversion, was in substance assigned ; and not only was it separable, but by a grant over of the reversion merely, (after rent accrued,) the statute itself worked a separation, and the assigned contract, (assigned by the devise with the reversion,) the "privity of contract," on which to sue, remained in the grantor of the reversion to enforce the collection of rent accrued to him, unless expressly transferred with his grant over ; and he could sue on that privity of contract, after his privity of estate was gone.

*Laws, p.* 254.) The preamble to this act, connected with the act, is thus: " Whereas it hath been doubted, whether the provisions contained in the act, entitled ' An act to enable grantees of reversions to take advantage of the conditions to be performed by lessees,' hereby intended to be amended, extend to any but assignees of reversions dependent on estates for life or years ; and whereas leases or grants in fee, reserving rents, *have long since been in use* in this state ; and to remove all doubts respecting the construction of the aforesaid act: *Be it enacted, That all the provisions of said act, and the remedies thereby given, shall be construed to extend as well to grants or leases in fee reserving rents, as to leases for life and years, any law, usage or custom to the contrary thereof notwithstanding ;"* (being said 3d section precisely.)

Here is legislative information that the rents, &c., reserved in these "leases in fee," are "*the* rents and services which have heretofore obtained among our citizens," spoken of by the revisers (as above.) Secondly. This is a legislative declaration that " leases in fee reserving rents," are valid, subsisting *leases,* in the hands of the *assignees* of both parties to them, and at the very least, brings this case within Ld. Holt's decision, (*Carthew,* 289, *fully affirmed,* 1 *Saund.* 241 *a, b,*) that by force of the statute " the very privity of contract" is transferred, as between the assignees of the lessor and lessee of *such leases.* Thirdly. This act makes the lessor's interest in such a lease, an entity assignable—with its remedies—as against the assignees of the lessee ; to be enforced by entry for non-payment of rent, or other forfeiture. Fourthly. Applying an act, enabling " grantees of reversions" to hold certain rights and enforce certain remedies, by reason of being assignees of reversions ; it, of necessity, *makes* the lessor's interest in such a lease—as well in his own hands, as in those of his assignees— *pro hac vice* equivalent to a reversion. Fifthly. Being subsequent (as was the act it amended) to the law concerning tenures, it is, if, and so far as, repugnant to that law, a *repealing* act, even without the express words " any law," &c.

Following this statute to the present revision, (1 *R. S. 1st ed.* 747, §§ 23, 24; 748, § 25,) we find the whole form altered, and some material changes in the substance; as well as (in the margin) a running commentary, by the revisers, bearing on the intent (and construction) of the new sections. This marginal comment, on § 23, is "rights of grantees, assignees, &c. of *lessors* of demised lands," not confining it to reversions; and on § 24, "rights of lessees and their assignees," not limited to be against grantees of reversions; as in 1 *R. L.* 364, § 2, it is. Next it is to be noted that, in the 2d and 3d lines of § 23, "the assignees of the lessor of any demise, and the heirs and personal representatives of the lessor, grantee or assignee," are entirely new words, found in *this act only,* neither those, nor any equivalent words, being in the act of 1788, or that of 32 Henry 8. And next, in the last line but one, " lessor *had,* or might have had, if such reversion had remained in such lessor,"—here the first "had" is added to the prior acts; thus giving to assignees, &c. all such remedies as the lessor *had,* (irrespective of any reversion,) *and* all such as he might have had, if a reversion had remained in him. All these alterations go to affirm under this act the positions above taken as to the third section enacted in 1805. In framing the 24th section, there were made some quite as material *omissions,* all tending to the same point. Thus, after the commencing words, "the lessees of any lands," the words (of the former acts) "for term of years, or life, or lives," are omitted, leaving it to apply to leases in fee; and the word "immediate," (against his immediate lessor,) is new; while the words of § 2, of 1788, " who shall have any gift or grant," &c. of the reversion of the same manors," (in the old act used to describe those against whom the lessee, &c. might have his remedies,) are entirely wanting. Thus—acting correlatively, on the subject, with the word *had* in the prior sections—preventing the liability from being limited to the reversioner.

To make the case still clearer, the 25th section extends the provisions of both these sections to "grants or *leases in fee,*

reserving rents, as well as, equally with, any other lease."
Thus the revised statutes continue in full force the 3d section
of the former act, while very essentially altering the first two ;
and the effect of that third section, now § 25, has been suffi-
ciently considered.   If it be, still, said that a reversion is
necesary to found the rights, &c., named in the act, and thereby
given, a reversion is made, for this purpose, by force of this
section.   If (under §§ 23, 24, as I understand them,) a rever-
sion be not necessary, the defendants' whole argument falls ;
and § 25 remains, declaring that *leases in fee, reserving rents
are valid and subsisting leases for both lessor and lessee,
and their assignees, and capable of being enforced, ac-
cording to their tenor, by and against both.*   See 3 *Denio,*
140, 141, and note by the reporter, (now Judge Denio,) fully
sustaining these positions.   The case of *Depeyster* v. *Michael*
(at page 506, 2 *Seld.,*) goes still further ; in holding that, not-
withstanding the statutes there cited, "the right of alienation
is inseparably incident to the estate of both lessor and lessee
in a lease in fee," and that " the power of the lessor to alien
his rent cannot be restrained."(*c*)

---

(*c*) There are some points, which were embraced in my original memoranda
for the written opinion, that were omitted in the final writing of that opinion,
because not deemed absolutely essential to the decision, and because the
length of the opinion, without them, exceeded the limits within which I had
intended to confine myself.   But as, from frequent questions that have been
put to me by members of the profession, I find those points are considered to
be of greater importance than I had deemed them, I append this note to the
opinion submitted to the court, as giving the views I originally held, as above
stated.

Is the statute of 1805 (as regards leases made between 1787 and 1805) void,
as being in contravention of that provision of the United States constitution
which forbids a state legislature to pass any " *ex post facto* law, or any law
*impairing the obligation* of contracts ?"   An *ex post facto* law is a *criminal,*
or *penal* statute, not a *civil* or *remedial* one, by all authorities, from Black-
stone's time to ours.   (1 *Bl. Com.* 46.   3 *Dallas,* 386, 394.   2 *Wash. C. C. R.*
366.   2 *Gallis. C. C. Rep.* 138.)   And giving, to the lawful holder of the rights
and interest in a covenant, *the legal power to enforce it ; enlarging the remedy*
on a contract and its conditions, by *giving the remedy* to and against *an as-*

This would seem conclusive, upon the further point, (made as to the whole case and especially as to the remedy by eject-ment,) that under or by a lease in fee reserving rent, there is no relation of landlord and tenant; and so the common law

*signee* of either party to the contract, is an unusual way of *impairing* the ob-ligation of the covenant or condition.

It is probable that the point *intended* to be made is, that the law of 1805 is void, because it imposes a burden upon a *vested estate* in fee simple abso-lute; and is thus a *retroactive* statute, in derogation of the *vested rights* of the grantee in the lease, or his assigns. This view, while probably meriting at-tention, admits of what I deem a complete answer. For never, in any legal decision, was it held that, *as between lessor and lessee* of a lease in fee, reserv-ing rent, the *lessee* took a fee simple absolute. *He*, and the *land* in *his hands*, and in the hands of *his heirs*, were bound by the reservation and condition, as a *duty upon the land*. Littleton says that " by force of the writing *the land is charged with the distress,*" (*and re-entry.*)

*Who*, then, took this fee simple absolute, in the land *freed of the charge*, in the cases before the court ? The *lessor* (Stephen Van Rensselaer) lived until 1839 ; so *his* assignment (being by devise, and *under the revised statutes*) was valid, to give *his* right of action *to his assignee*. Nor does it appear that in either of these cases the *lessee* assigned or transferred the title to the land, *prior to* 1805. In the *Ball* case it appears in proof that the *original lessee held the land until within twenty-five years*, bringing it down to a time *after* 1830. And in each of the other cases the *arrears*, for which the suit is brought, accrued within a period of *less than twenty years ;* thus, by impli-cation, showing the *actual payment of these identical rents*, down nearly to 1840.

Now, even if either of these lessees had granted over the land *prior* to 1805, the *payment*, by the lessee's *grantee* or *assignee*, of the rent, *after* 1805, or at *any time after* he took his assignment or deed, is an *acknowledgment* that *he took the land, not* in fee simple absolute, but *subject to the rent*, and under *his contract to pay* the rent. And, by estoppel, *he*, and *the land*, would be bound by the *privity of contract* (so acknowledged) whereby, "*by force of the writing*, the *land* is charged with the distress and re-entry." There is probably no one instance in the state, where the rent, reserved by any lease in fee, has not been paid by the terre-tenant, long after 1805. And, as matter of fact, it is quite notorious, that until long after 1830 the grants or assign-ments by the lessees were always *expressed to be subject* to the rents, &c. of the original lease in fee ; *referring thereto* for covenants and conditions to be kept by the assignee.

But were this not so : Is the act of 1805 void for interfering with vested rights, by retroaction ? It is not so by the constitution of the United States, (3 *Dallas*, 386, 394,) that constitution not touching the supreme authority—

remedies between landlord and tenant cannot exist; and the statute remedy (2 *R. S.* 1st *ed.* 505; 4th *ed.* 750) is not capable of enforcement. This position in fact, and of necessity, takes the ground that, though called a lease, it is really a grant in fee simple absolute. This is difficult ground to main-

the actual sovereignty—of a state legislature, any *further* than its *express* provisions go. Is there any restriction on the *state sovereignty*, in the hands of its representatives, whereby such legislation is made void? It was not so held in the case of *Calder* v. *Bull*, (3 *Dallas*, 386.) Nor did any English case, that I find, ever hold that an assignee of a lessee by assignment, *prior* to 32 Hen. 8, was not, by that statute made liable to the action for rent, &c., although his *release* from the obligation (by reason of the non-assignability of the right thereto) was *as absolute* as can be any estate here claimed to have become *vested* under the statute of 1787.

Retroactive remedial statutes are not of very rare occurrence. And where they, by retroaction, plainly and expressly *affect prior rights*, and *make new remedies*, courts find themselves bound to enforce them. In 1 *Hill*, 334, it is held that an " *express* provision was allowed to have such an operation," (citing two adjudged cases.) And again, in 2 *Hill*, 239: " it is a general rule that a statute affecting rights and liabilities should not be so construed as to act upon those already existing. To give it that effect, the statute should *in terms declare an intention so to act*." And, in 11 *Paige*, 403, " courts of justice will *apply* new statutes only to future cases which may arise; *unless* there is something in *the nature* of the new provisions adopted by the legislature, or *in the language* of such new statutes, which shows that they *were intended to have a retrospective operation*." Taking these cases to be sound law, there is little room for debate; for there can hardly be framed any more direct and express declaration of intent—any more express provision—to give a retroactive effect, (that is, an effect on *all then existing* leases in fee reserving rent, and on the *then existing* assignments thereof,) than those of the act of 1805. " Whereas leases in fee reserving rents have long since been in use in this state," and " the remedies thereby given *shall be construed to extend* to leases in fee reserving rents, *any law, usage or custom to the contrary thereof notwithstanding*."

Nor is it, in reality, any attack upon a vested right. It is merely *preventing a construction* of the statute of 1787, (and that a construction *not* of the *direct purpose* of the act,) from giving to the lessee an estate *different* from the one he *agreed to take*, and from thus enabling him to commit a *gross wrong*, in *palpable evasion of his own sealed covenant*. It is, by extending the assignability of a chose in action, (as our code has since done on a much more extended scale,)—merely compelling the *land*, and *its owner*, to *fulfill the contract* of purchase, and to *pay the interest of the purchase price*, of that for which *no principal* was ever paid.

Van Rensselaer *v.* Smith.

tain, when the express statute not only legalizes them as leases, but speaks of them in immediate connection with, and as un-equivocally leases, as leases for years. The very nature of a lease is to make that relation.

It is not allowable, now, to say that tenure (in technical strictness, and according to its feudal meaning) is necessary to that relation. That technical term is strictly *feudal*, and by our statute has ceased to exist in any shape, even as regards the state. The duty of allegiance, the only duty now owed to the state, is common to every citizen, (independently of any holding of land,) and has no connection with the land. He no more holds his land by that tenure, than he does his horse. (*See Taylor's Landlord and Tenant*, §§ 10, 11.) But if, departing from this technical strictness, the word is used to mean, in regard to land, what is commonly understood by it, and what alone the law can now interpret it to mean; it covers every case where one holds land, &c., of or from another upon any terms or conditions, or subject to any reservation, whereby the absolute ownership of the estate is qualified. The terms of possession, or the mode and limit of enjoyment, being parcel of, and taking the shape of, a contract, (express, or implied, as the estate or the case may be,) constitute a lease, and, the parties to this lease are in the relation of, and are, landlord and tenant. (*Taylor's Landlord and Tenant*, § 12.) Taylor also says "the payment and receipt of *rent* is the ordinary acknowledgment of a tenancy." (*Id.* § 22.)

But were a technical tenure necessary to make that relation, the revisers (as above cited as to § 4,) show the lands that are held under these leases in fee, are "subject to those rents and services incidents of the socage tenure;" which incidents *carried with them, at common law,* as well as in common sense, the relation incident thereto—inherent in the incident of liability to pay *rent proper*—the relation of landlord and tenant.

But our statutes will sufficiently explain this point also; and that in the very statute that gives ejectment for non-pay-

ment of rent, (2 *R. S.* 1*st ed.* 505, 4*th ed.* 750.)  In the first place the *title* of the act; "of the recovery of possession of demised premises for non-payment of rent by ejectment."  It has no *qualification*, as to being a *landlord's* remedy; thus conceding that he who is entitled to the rent, is entitled to the remedy.  In its first section (§ 30,) the condition on which ejectment may be brought, is, "if the landlord has a subsisting right by law to re-enter for the non-payment of such *rent*."  And has not the defendant's whole argument proceeded on the basis that no one but the landlord can have that *right?*  And is that not one of the rights *expressly reserved* in a lease which the statute says is good; (of course, *making good* all lawful conditions therein.)  And, further, the statute has made this very right of entry, *in such a lease, assignable, with its remedies.*  (§ 23, 25, *as above cited.*)  These two sections positively give this remedy by entry, (and entry and re-entry are all one, *Littleton,* § 347,) to the assignees of lessors in fee, as their lessor had it (by the tenor of his lease) thus making the lessor a landlord.

Again (*in* § 33, *p.* 506,) the margin of first edition, published by the revisers, (so that it is a contemporaneous construction of the surest authority;) had "when premises to be restored to *tenant;*" while the body of the section has it, "premises shall be restored to *lessee.*"  The same section says, when possession has been taken "by the *landlord,* the lessee, his assigns, &c., may pay or tender to the *lessor* all the rent in arrear," &c., while by the 30th section the rent being in arrear to the *landlord;* and *he* having sued and taken possession; and now, to recover this possession from *him,* those arrears of rent are to be paid to the *lessor;* the two (landlord and lessor,) are of course the same person, and a lessor is none the less a lessor, for having given a *lease in fee.*  The 34th section makes this equally clear; and the whole act, as well as the one for which this was substituted, (1 *R. L.* 440, *&c.,*) uses lessor and landlord, and lessee and tenant, as convertible terms.

Nothing but the somewhat peculiar nature of this litigation

could justify going into such details, on such a point; as, for any ordinary purpose, the first maxim of all construction would suffice, viz., that words are to be taken in their most usual and popular sense, until some cause be shown to the contrary. And no one will pretend that in the usual and popular sense, there is any doubt that any lessor is a landlord, and any lessee a tenant; or that rent is paid by a tenant and received by a landlord.

Still there are, in this state, authorities sufficient to settle this question for this state. In *Van Rensselaer* v. *Snyder*, (3 *Kern.* 302,) on one of these leases, Gardiner, Ch. J., says, " the contract between the landlord and tenant in this case provides," &c.; and he so calls the parties in the whole decision. In *Hunt* v. *Comstock*, (15 *Wend.* 667,) Nelson, Ch. J., speaks of premises " rented," or " let" at a rent, as signifying the relation of landlord and tenant, to found *summary eject-ment.* And even *Depeyster* v. *Michaels*, (2 *Seld.* 467,) while it undoubtedly decides that the lessor in fee had no reversion (sufficient to found thereon covenants in *restraint of alien-ation;*) and that between such lessor and lessee there was no *technical English tenure*, does *not* decide that they are not landlord and tenant. But, (page 507) speaks of the " alien-ation of the *tenant's* interest in the land." And even if it did say what is claimed, that case (decided in 1852,) *cannot over-rule* 3 *Kern.* 303, (decided 3 years later.) If they clash, the *former* is overruled.

But it is claimed that the statute of 1846, (*Laws of* 1846, *p.* 369,) having abolished distress for rent, has thereby changed the nature of this rent. One view of this is answered in *Main* v. *Feathers*, (21 *Barb.*) But the defendants now take another view of that act; and take us *back* of the statute, to the niceties of a *common law* re-entry; giving the distinction between that and a statute re-entry. About this there need be no discussion. This action is professedly on the statute; the statute having *substituted* an ejectment, (or a statute re-entry *by suit*) in place of the *common law* actual

re-entry to be followed by ejectment by suit. And the preamble to § 23, 1 *R. L.* 440, in lieu of which § 30 (above cited) was enacted; says, that § 23 was passed to *avoid* "the niceties that attend re-entries at common law, and forasmuch as, *after such* re-entry the landlord or lessor must still recover in ejectment." It therefore gave ejectment without formal re-entry; i. e. gave re-entry by ejectment; and I confess myself unable to see any thing in the new application, by the defendants, of this legal fact. They say the legislature, in the act of 1846, "did not intend in the use of the word reentry, to provide a new action of ejectment." Certainly not. But they meant to *apply* a known action in a *new* way; (so that abolishing the remedy by actual distress, should leave the landlord's right to ejectment for rent arrears, substantially unimpaired,) as they say "whenever the right of re-entry is reserved and given to a grantor or lessor in any grant or lease, in default of sufficiency of goods and chattels, whereon to distrain for *any rent due,* such re-entry may be made *at any time after default* in payment, &c., provided 15 days' previous notice of such intention to re-enter, be given by the grantor or lessor, &c., notwithstanding there may be a sufficiency of goods, &c." Terms so broad and general, would seem quite sufficient to cover a statute manner of making such re-entry, as well as a common law one. One of the judges of the court of appeals, (whose long holding of that office, and his high standing there, give great weight to his construction of any statute,) has, by placing section 3 of 1846, as section 10, (2 *R. S.* 651, 4th ed. by *H. Denio and Wm. Tracy,*) in and of the act which gives this statute ejectment, shown that he understood it to apply to that remedy; *not to repeal* the 9 preceding sections, as it, (the act) must, if these defendants are correct, since original section 30 gives the remedy only "where no sufficient distress can be found on the premises."

It is, besides, decided by the court of appeals, (3 *Kern.* 303,) that this section 3, of 1846, amounts to saying that

" thereafter the tenant could not have a sufficient distress" on his premises. This being so, I see no process of reasoning by which the latter statute can be prevented from, in effect, *striking out of,* or rendering inoperative in, section 30, the words " where no sufficient distress," &c. ; especially as it had done this very thing, by the same words in these leases. (*See* 3 *Kern.* 303, 305.) This case in 3 *Kern.* however, expressly holds, that the statute of 1846 having taken away one remedy, " provided a new remedy" for the case ; which remedy is independent of the contract. (*See also* 2 *Barb.* 319.)

As to the defendants' points in regard to the service of the 15 days' notice, and the sufficiency of that notice ; were their positions sound in law, some, at least, of them are not true, in these cases, as to the fact.

1. They say it is not alleged to have been served on the lessee or his assigns, &c., but on the defendant, who is not alleged to be the assignee, but merely in possession. Now, in the case of Christie and others, plaintiffs, the complaint, (and the case comes up on demurrer to it) alleges that ever since the execution of the original lease, the premises have been held and occupied by the lessee, his heirs and assigns, under said lease ; and the same complaint says " the said defendant is in possession ;" of necessity, as either heir or assignee, and either is within the statute. In the case where Ball is defendant, the complaint, and nothing appears on the trial to vary it, is perfectly explicit and full. At folio 34, 5, it has the same averment as in the Christie case, of continued possession in the lessee, his heirs or assigns ; at folio 35, 6, it avers that the lessee's interest, &c., by assignment legally made, came to and vested in said defendant ; at folio 39, " the premises of which defendant was assignee ;" and " after the defendant became, and while he was assignee as aforesaid ;" and at folio 41, " the plaintiff gave notice in writing to the said defendant and said John Ball, assignee as aforesaid."

2. That it was not served till *after* the *rent* became due ; and that the notice itself shows that it was only a cautionary

notice, that if thereafter there should be default in payment of rent, the plaintiff would certainly re-enter. In the complaint against Ball, the purport only of the notice is given, thus: that the plaintiff intended to re-enter "in pursuance of the covenants, reservations and conditions" of the lease; while in the suit of Christie and others, plaintiffs, this purport is more fully given; "that more than fifteen days prior to the commencement of this action, plaintiffs served a notice," &c., declaring that plaintiffs intended to re-enter under said lease, unless the said arrears of rent should be paid within fifteen days after the service of said notice. Yet the defendants say this is not a notice that a certain amount of rent is due, and if not paid there will be a re-entry. As to the Ball case, a re-entry in pursuance, &c., could be had only after breach; and the notice must be read as meaning, because the covenants, &c., had been broken. A notice of intention to re-enter, provided default should thereafter be made, would be merely a bald absurdity, amounting to no more than that the plaintiff considered his lease and its covenants valid in law. That notice might as well be given fifteen years before suit, as fifteen days. But aside from argument, this point is decided in 3 *Kern.* 304 *and* 306.

The point that the plaintiff by serving the fifteen days' notice, required by the statute of 1846, to entitle him to the re-entry, *waived* the previous forfeiture, because such notice is equivalent to accepting rent, as an acknowledgment of an existing tenancy, certainly has the merit of novelty, in this country. And it probably has not in any other country had a parallel since an English court held that making the affidavit, to move for leave to plead the statute of limitations, was a waiver of the defense as being an acknowledgment of the debt. (4 *East,* 604.) If taking the course prescribed by the statute, to avail one's self of the statute remedy, be a waiver of the right to that remedy, then the statute *defeats itself,* and is practically, so much blank paper.

The case of *Depeyster* v. *Michaels* on one of these leases in

Van Rensselaer *v.* Smith.

fee, (2 *Seld.* 467,) is claimed by the defendants to have decided the whole controversy; and in their favor. It decided that the plaintiffs have *not a reversion, or such* an interest, in the land as will enable them to attach thereto conditions that are *against the policy of the law,* as being in *general* restraint of alienation. But it goes no further. There is (in that case or elsewhere,) no decision or intimation, that a covenant to *pay rent* (with its incidents) is in restraint of alienation. The case just cited, says, (at page 507,) "the lessor's right of entry for breach of *lawful* conditions, is *not* defeated or impaired by the sale of the lessee's interest in the land;" and, "rent is separable from the ownership in fee of the land; but the right of alienation is not. The reservation of rent does not affect the alienation of the tenant's interest in the land;" and it then goes on with clear and satisfactory reasons why a reservation of part of sale money, (*differing* from reservation of rent,) is illegal; and, on page 508, adds; "the covenant of the lessee to pay, *which runs with the land, and the lessor's right to re-enter for non-payment,* are practically a sufficient security for the rent;" and until the defendants get that case reversed, such security will be found sufficient.

The further position, that we have no estates in fee *upon condition,* finds no countenance from that case. And the case in 3 *Kern.* 302 decides that the final condition, in all these leases (one entirely separate from the covenant to pay rent with its condition of re-entry for non-payment attached,) is a valid condition, for this very purpose of re-entry for non-payment of rent; that being the very point of the case.

As to the ground, (taken at various stages of the argument,) that one or another right, or right of action *is not assignable;* it might be well to consider that the code has, on that head, marvellously little of the common law aversion "to stirring up of suits," and that it is now rather difficult to find any right or interest that is not assignable.

I am unable to see any sound reason, or find any binding decision, that would authorize the sustaining of either of the

demurrers; or that would reverse the judgment of the circuit against Ball. As I cannot but hold, that for the state of New York, the statutes of New York are more obligatory than all the statutes and decisions of other states and nations; and that by our statutes (certainly since 1805,) the leases in question have been valid as leases; and that the estates, or rights by and under them, (of both lessor and lessee,) have been assignable; and that, at least since January 1st, 1830, the statute remedy of re-entry by ejectment has been applicable by and to the parties to such leases; which remedy is not impaired by the statute of 1846.

In *Van Rensselaer* v. *Hays*—Judgment at the circuit should be affirmed. In *Van Rensselaer* v. *Ball*—New trial denied. In *Van Rensslaer* v. *Smith*, and *Christie and others* v. *De Friest*, the decisions overruling the demurrers should be affirmed.

WRIGHT, J. The first two of these actions are to recover arrears of rent; the others, ejectment for the non-payment of rent. The rent was reserved in grants in fee, or fee farm leases, of parcel of the manor of Rensselaerwick.

The original indentures granted the land, with the appurtenances, to the grantees named therein, and their heirs and assigns forever, yielding and paying therefor a perpetual annual rent in wheat and fowls, and performing annually one day's service with carriage and horses. The grantees for themselves, their heirs, executors, administrators and assigns, covenanted to pay the yearly rent so reserved, and agreed that if such rent or any part thereof, happened to be behind and unpaid for the space of twenty-eight days next after the days of payment, it should and might be lawful for the grantor, his heirs and assigns, to distrain for such rent in arrear. The indentures also provided that in case no sufficient distress could be found on the premises, or, if the covenant to pay the rent should be broken, then it should be lawful for the grantor, his heirs and assigns into the whole of the granted premises, or

into any part thereof, in the name of the whole, to re-enter, and the same to have again, repossess and enjoy. These indentures were executed at several periods, in 1790, 1792, 1794 and 1796, between Stephen Van Rensselaer, the then proprietor of the lands within the Rensselaerwick patent, and the respective grantees named therein. The plaintiffs are the devisees or assignees of the original grantor, and the defendants the assignees of the original grantees, and in possession of the granted lands, or a part thereof. The question involved is, whether either covenant or ejectment can be maintained against such assignees, by the devisees or assignees of the original grantor. It is not controverted that if, under and by virtue of the indentures, the relation of landlord and tenant was created, and is subsisting, the assignee of the land cannot defend himself against the covenant to pay rent, as such covenant would run with and fasten upon the estate or lands, in the hands of the assignee. Neither is it denied, that if the relation of landlord and tenant exists, and the statute remedy by ejectment subsists unimpaired, ejectment may be maintained.

Undoubtedly, in an indenture of this character, conveying lands in fee, the covenants in respect to the payment of rent contained therein, would personally bind the covenantor. A covenant to pay rent, however, is a mere chose in action, and at common law was not assignable. As an exception to the principle, the common law permitted the transfer of covenants, not by the direct operation of an assignment, but as incident to land when passed by assignment; provided they were of that nature, capable of running with land. (*Notes to Spencer's case, Smith's Lead. Cas, Am. ed. of* 1847, 135.) Of course, without this capacity of running with the land, there could be no remedy by action on the covenant, except between the covenantor and covenantee. The capacity only exists when the covenant concerns or affects the land; but it has been held that it is to be regarded as affecting the land though not directly to be performed upon it, provided it tend to increase

Van Rensselaer *v.* Smith.

or diminish its value in the hands of the holder. It is claimed that there is still another rule applicable to this class of covenants, viz: that "independently of tenure and consequent privity of estate, or, at all events, of such a relation between the parties, as would agreeably to the feudal law have created tenure and privity of estate, the covenants only run with the land, when and as for the benefit of the land. For the purpose of imposing a charge or burden upon the land, they never run." If this restriction rests on authority, it would seem to follow, that when the land is conveyed in fee at the time of making the covenant, it will not, when the principles of the English statute *quia emptores* are in force, run with the land on a subsequent conveyance, as to its charge or burden, as, it has been thought, since that statute, a conveyance in fee creates no tenure or privity of estate, and consequently only the benefits of the covenant can be attached to the estate. A covenant to enure to the benefit of a stranger to the estate, would not run with the land as to its charge or burden. So, also, it seems theoretically plausible, that if a grantor conveys his whole estate, reserving nothing of the estate or lands in himself, he cannot charge or burden the land, in the hands of an assignee, even by a covenant in the deed of conveyance ; for having parted with his entire interest, reserving nothing, he is as much a stranger to the land as though he had never owned it, and has no estate to which the covenant can attach. The defendants contend, that whilst the direct object of the English statute of *quia emptores terrarum,* (18 *Edw.* 1,) was to prevent subinfeudations, its indirect and consequential effect was to make a grant in fee a conveyance of the grantor's entire interest, and as covenants could only pass as incidents to some estate of the party in whose favor they were made, such grantor was left without any estate to which covenants or conditions could be annexed.

It is urged, also, that the indirect consequence of leaving the grantor and covenantee with no estate, was to remove the

Van Rensselaer *v.* Smith.

only foundation upon which covenants and conditions could be imposed:

By the common or feudal law, no grant, whether in fee, or for life or years, created any other relation than that of landlord and tenant. A grant in fee did not pass the right of property, but only the right of possession. The grantor remained the lord of the soil, notwithstanding the grant. There was tenure or privity of estate between the grantor and grantee, constituted by the one party having the right of property, or, as more commonly called the reversion, and the other the right of possession, subordinate to the reversion or right of property. At the termination of a lease for life or years, the soil reverted to the lord, and in a grant in fee, or, as it was anciently called, a fee farm grant, there was a possibility of reverter by escheat. One of the incidents of feudal tenure was *escheat,* or the reversion of the estate on a grant in fee simple, upon a failure of the heirs of the owner. The escheat was originally called the reversion. (*Litt.* §§ 214 *to* 217. *Butler's note to Co. Litt.* 192 *a;* 3 *Kent,* 495, 506 ; *Burgess* v. *Wheat,* 1 *W. Black.* 133.) Even if no services were reserved on a feoffment in fee, there was still a tenure created. (*Litt.* § 216. 2 *Inst.* 275, 511. *Co. Litt.* 143 *a.*) The nature of the feoffor's privity with the estate conveyed, whether in fee, or for life or years, was such as to make any service, charge or rent which he reserved on the conveyance a rent service, for which, without a clause of distress in the deed under which it arose, he might distrain of common right. (*Litt.* § 216. *Gilbert on Rents,* 12.) To have constituted a rent service, it was enough that a reversionary interest remained in the grantor or lessor ; and the right to the *escheat* in the grantor in all conveyances in fee, with a rent reserved, was sufficient estate in the grantor to constitute privity with the grantee, and to carry the relation of lord and tenant to their respective assignees, and also the covenant or any other covenant concerning the land, along with the land.

The indentures in these cases, or, as they are ordinarily

called, manor leases, though grants in fee, would indisputably, at common law, have created the relation of landlord and tenant, and the rent reserved would have been a *rent service*. If a rent service still, or the relation of landlord and tenant, subsists, or the grantor and his assigns retain any estate or reversionary interest in the lands whatever, sufficient to carry a covenant to pay rent, it is conceded there is no defense to these actions. A still further concession may be made, that unless the British statute of *quia emptores* was in force in the colony before the revolution, or, since the revolution, a change had been wrought in the common law, by statute, precisely equivalent to that produced by the English statute, there is no defense. Unless one or the other of these things appear, the common law relation of landlord and tenant subsisted between the original grantor and grantees, and the rent covenant, in the original indentures, passed as to its burden to the assignee of the lands.

It has been assumed, heretofore, that the statute *quia emptores*, enacted in England, in 1290, was never in force in the colony of New York. Indeed this is now conceded. The colonial government created manorial tenures. The statute concerning tenures, passed in 1787, recognizes the existence of these manorial tenures within the state. This statute, therefore, did not and could not affect fee farm grants or leases. The rules of the common law applied to them. They were fee farm estates in land, reserving rent as a consideration for the grant. The rent reserved was a rent service; and the covenant to pay fastened itself upon and ran with the land.

It was a real, as distinguished from a personal covenant, binding the assignee as to its burden. The grantor was entitled to the rent and services incident to tenure in socage, and to the reversion or escheat. Such was the condition of things up to the organization of the state government. In 1779 a statute was passed transferring the seignory of all lands within the state, and the escheat, to the people, from the 9th July, 1776. In 1787 another law was enacted, entitled "An act

concerning tenures." The first section of the act was sub-
stantially a transcript of the English statute of *quia emptores;*
the second abolished military tenures, and all their incidents,
from the 30th August, 1664, and also tenure *in socage in
capite,* with all the fruits and consequences; the third con-
verted all manorial and other tenures into free and common
socage; the fourth required all conveyances and devises of
any manor lands, &c. theretofore made, to be expounded as
if the said manors, lands, &c. had been held from the begin-
ning in free and common socage only; the fifth declared that
the act should not be construed to take away or discharge
any rents certain, or other services, incident to or belonging
to tenure in common socage, due to the person previously en-
titled to them, or the fealty or distresses incident thereunto.
"These statutes," says Judge Ruggles, in *De Peyster* v.
*Michael,* (2 *Selden,* 467,) "performed the same functions
and wrought the same changes in the feudal tenures of this
state, as the statute of *quia emptores* did in England. They
put an end to all feudal tenure between one citizen and an-
other, and substituted in its place a tenure between each land-
holder and the people, in their sovereign capacity." Their
effect, unquestionably, was to abolish *feudal* and substitute
*allodial* tenure; but whilst destroying the former system,
some of its incidents were preserved. Rents certain, or other
services, incident or belonging to tenure in common socage,
were excepted from the effect of the statute, and the rights
of the grantor of lands in fee, or for life or years, at common
law, in this respect preserved, with the feudal incidents of
fealty and distress. It was not the intention of the statutes
to divest the proprietor of manor lands of property in such
lands, but to declare that all lands within the state should be
held in free and common socage only, and preserving the feu-
dal incidents of fealty and distress. It is true that their in-
direct and consequential effect upon a grant in fee of manor
lands, reserving rent, was to divest the grantor of the *escheat;*
but it is quite apparent that in respect to lands before held

under feudal tenure, even in case of a grant in fee, it was not intended, by any thing in the statutes, to work a change of the technical relation of landlord and tenant. Indeed the act concerning tenures recognizes that relation as existing, and to continue to exist, and, in adopting allodial tenure, provided that nothing contained in the act should be construed to take away or discharge rents certain, or other services incident to the tenure in common socage, due or to grow due to any mesne lord, or other private person, or the fealty or distress incident thereunto. The design was to make the people the chief lords of the fee, and entitled to the escheat of all lands within the state; to strip from the manor grants the characteristics of military tenure, and tenure *in socage in capite,* with its fruits and consequences; but ·not to destroy tenure utterly, and the relation of landlord and tenant. Indeed rent service was an incident of the socage tenure which was preserved. That the effect of the statutes was not supposed to be, in case of a manor grant in fee, reserving rent, to change the legal relation of the parties to such grant, from that of landlord and tenant to that of vendor and vendee, but such grants were regarded, as in England, as fee farm demises, under which a tenancy existed, is apparent from the latter act. ' The view is strengthened by subsequent legislative declaration. In 1788 an act was passed to enable grantees of reversions to take advantage of the conditions and covenants to be performed and kept by lessees. It empowered such grantees, as against the lessees, their heirs or assigns, to enter for the nonpayment of rent, and gave them the same remedy, by action against the said lessees or termors, and grantees, their executors, administrators and assigns, as the lessors or grantors themselves ought, should or might have enjoyed. (*Laws of New York, Kent & Radcliff, vol.* 1, *p.* 105.) In 1805 another act was passed, extending all the provisions of the last mentioned statute, as well to grants or leases in fee, reserving rents, as to leases for life or years, any law, usage or custom to the contrary notwithstanding. This act was pre-

Van Rensselaer *v.* Smith.

ceded by, and connected with, a preamble as follows: "Whereas, it hath been doubted whether the provisions contained in an act entitled 'an act to enable grantees of reversions to take advantage of the condition to be performed by lessees,' hereby intended to be amended, extend to any but assignees of reversions, dependent on estates for life or years; and whereas, leases or grants in fee, reserving rents, have long since been in use in this state, and to remove all doubts respecting the construction of the aforesaid act, *be it* enacted," &c. (4 *Webster & Skinner's Laws*, 254.) The English statute (32 *Hen.* 8, *ch.* 34) only extended to assignees of the rent and reversion where the lease was for life or years, the right to take advantage of the covenants in the leases. This act placed grants or leases in fee on the same footing.

The operation of the statute, as amended, upon the grants now in question, was to continue the relation of landlord and tenant between Stephen Van Rensselaer and his grantees in fee, where rent was reserved, with a condition of entry for non-payment of rent, and to make the grantor's or lessor's interest in such a grant or lease, an entity assignable, with its remedies, as against the assignees of the grantee or lessee, to be enforced by entry for non-payment of rent, or other forfeiture. The grants in fee were put on the same footing as indentures of lease for life or years, and the like character of assignability attached to them.

They were called leases or grants in fee, and the grantees treated, not as the absolute owners of the land in fee simple, owing no service or duty to any one, but as lessees and tenants of land charged with the covenant to pay an annual rent, and with the further condition imposed, of entry for the non-payment of such rent. The indirect consequences of the statutes concerning tenures and escheats, may have been to take from the grantor in fee the *escheat*, or possibility of reverter, which created privity of estate at common law; but it seems to me that, whilst taking from him the escheat, the legislature intended, and were successful, in continuing privity

of estate, as much between grantor and grantee in fee of·
manor lands, reserving rents as in leases ·for life or years.
There never was any doubt of the existence of this privity in
the case of a grantor or lessor for life or years.   He was the
owner of the reversion.   By the act of 1788 the grantee or
assignee of the reversion, his heirs and assigns, were enabled
to have and enjoy like advantages by entry for non-payment
of rent, and action for non-performance of conditions, cove-
nants and agreements contained and expressed in their leases,
demises or grants, against the lessees and grantees, and their
assigns, as the lessors and grantors themselves, or their heirs
or successors, might have had or enjoyed at any time, in like
manner and form as if the reversion of such lands had re-
mained or continued in the same lessors or grantors.   In
1805 it was doubted whether these provisions extended to any
but assignees of reversions dependent on estates for life or
years, and as leases or grants in fee, reserving rents, had long
been in use in the state, to remove all doubts, the legisla-
ture applied the provisions and remedies, as well to grants or
leases in fee, reserving rents, as to leases for life or years.
Here was a legislative recognition of grants in fee, reserving
rents, as valid and subsisting in the hands of the assignees
of both parties to them ; while the provisions of a statute
enabling grantees of reversions to hold rights, and enforce cer-
tain remedies, by reason of being assignees of reversions, were
applied.   The effect would seem to have been to make the
grantors' or lessors' interest in the grant, *pro hac vice*, equiv-
alent to a reversion.   The people of the state having taken
the escheat of all lands to themselves, and thereby removed
the common law foundation, on which privity of estate be-
tween grantor and grantee in fee of manor lands rested, by
operation of subsequent statutes that privity was continued.
These statutes were, in substance, re-enacted in 1813, and
again in the revised statutes.   Indeed upon the revision of
the statutes, in 1830, the "*Act concerning tenures*" was re-
pealed, (3 *R. S.* 129,) at the suggestion of the revisers, and

Van Rensselaer *v.* Smith.

with the view of subjecting all lands to the rents and services which had before obtained amongst the citizens of the state, and the rights annexed thereto by the common law, whilst abolishing feudal tenures, with their incidents, it was enacted that such abolition should not take away or discharge any rents or services certain, which, at any time before, had been, or thereafter might be, created or reserved. (*Revisers' Reports, part* 2, *ch.* 1. 1 *R. S.* 718, § 4.) The relation of landlord and tenant was preserved, as well in respect to grants or leases in fee, reserving rents, as to leases for life or years. Such grant was treated as a demise of the premises holden. It was styled indiscriminately a grant or lease; and like characteristics of assignability given to it. (1 *R. S.* 747, §§ 23, 24, 25.) This relation of landlord and tenant between the parties to a grant in fee, reserving rent, would, agreeably to the feudal law, have created tenure and privity of estate; and as the relation has been carefully guarded and preserved by statute, in respect to grantor and grantee in such conveyances, and their respective assignees, I cannot see how they are to be treated and considered only as vendor and vendee of the lands, between whom, confessedly, there would be no privity, or any interest or estate left in the grantor, whereby conditions might be imposed, or the burden of covenants attached to the land. If privity of estate be the result of tenure, and to constitute such privity the position of the parties must be such as would formerly have given rise to the relations of tenure, it seems to me that this has been effected by statute. If a tenure (according to the feudal meaning) be necessary to constitute the relation of landlord and tenant, lands held under grants or leases in fee, with reservations of rent, have been, by statute, expressly subjected to the incidents of socage tenure, viz : rents and services; and those incidents at common law carried with them the technical relation, whether the rent reserved in a grant in fee would, at common law, be a *rent service* or a *rent charge.* The provisions of the statute alluded to, assimilate a rent reserved

upon a conveyance in fee to one accompanied by a reversion, and apply the relations and incidents of an indenture of the latter description to one of the former.

At common law a covenant ran with the land, and carried with it a consequent right of suit, where there was an accompanying conveyance of the land to the covenantor. The performance of the covenant was regarded as part consideration for the conveyance, without which it would not have been made. The statute of *quia emptores* destroyed tenure as between feoffor in fee and feoffee, changing rents service into rents charge, and as it is claimed, constituting the grantor in fee in effect a vendor of land instead of the landlord, and the grantee a vendee instead of a tenant. That statute never had any existence here. Our statutes put an end to the feudal system and technical feudal tenure, and substituted tenure between each landholder and the state. Yet some of the incidents of feudal tenure were preserved. The abolition of feudal tenures was not to be construed so as to take away or discharge rents certain or other services incident or belonging to tenure in common socage, or the fealty or distresses incident thereunto. The relation of landlord and tenant was to continue to exist. With respect to leases for life or years, it has never been doubted as existing, notwithstanding the entire system of feuds, if it ever practically existed in the colony, has long since been abolished in the state. Tenure, within feudal meaning, has long been unknown, yet the feudal relation as regarded lessors and lessees for life or years, is conceded to have always existed. Rents certain and other services incident or belonging to tenure in common socage, had, prior to the act of 1787, been legally reserved in leases or grants in fee, as in those for life or years, and they with the feudal remedies were not taken away and discharged more in the former than in the latter case. It is true that by giving the *escheat* of all lands in the state to the people, what, in feudal meaning, was known as the reversion of a grantor in fee reserving rents was taken away ; but still in regard to such grants under the operation of our

Van Rensselaer *v.* Smith.

statutes the effect was not to dissolve the relation of landlord and tenant, so as to make such a grant, what it was never intended to be by the parties, an unconditional parting by the grantor with his entire estate or interest in the lands, so that in the hands of an assignee there would be nothing left to which a covenant or condition could attach. Rents and services, incidents of socage tenure, reserved in grants in fee, and fealty and distress, incidents of feudal tenure, and the conditions of entry for non-payment of rent, were to be unaffected, by transferring the escheat from the grantor of the fee to the state. That the relation of landlord and tenant was regarded as subsisting, as well in case of grants in fee, reserving rents, as in leases for life or years, is manifest from early legislative action. The former were placed on the same footing with the latter. They were declared to be valid subsisting leases in the hands of the assignee of both grantor and grantee, and the like rights, relations and remedies attached to them. · If this was not wholly done by legislation prior to 1830, it was then finally accomplished. The very grants in these cases were legalized as leases ; and in the entire abolition of feudal tenures, it was enacted that such abolition should not take away or discharge any rents or services certain, which at any time before had been or might thereafter be created or reserved. (1 *R. S.* 718, § 4; *id.* 747, §§ 23, 24, 25.) If rents or services certain, before created or reserved, were not to be taken away or discharged, by a radical change in the tenure by which property was held, it would seem to follow that the same rights, relations, and remedies by action or otherwise, were necessarily retained.

The covenants to pay rent in the cases we are considering run with the land, as to their burden, and may be enforced as against the respective assignees. If by force of our statutes privity of contract was not transferred as between the assignees of the grantor and grantee, in the indentures, there is privity of estate. Under our laws the relation of landlord and tenant is made to exist as between the grantor and grantee in

a conveyance in fee, of manor lands, reserving rents. A stat-
ute privity is created, enough to pass a covenant to pay rent
to each subsequent assignee of the land conveyed.

The revised statutes authorized an action of ejectment, to re-
cover the possession of demised premises, whenever any half
year's rent or more should be in arrear from any tenant to his
landlord, and no sufficient distress could be found on the prem-
ises to satisfy the rent due, provided the landlord had a subsist-
ing right by law to re-enter for the non-payment of such rent;
and the service of such a declaration in such action was to be
deemed and stand instead of a demand of the rent in arrear
and of a re-entry on the demised premises. (2 *R. S.* 505,
§ 30.) This statute only applied to cases where the conven-
tional relation of landlord and tenant existed. That relation
has always been assumed by the courts to exist, under and by
virtue of the manor grants in fee reserving rents; and I have
endeavored to satisfy myself that that assumption was well
founded. In 1846 the legislature abolished the remedy by
distress for rent, rendering it impossible that there could be
any "sufficient distress" on or off the premises. The land-
lord was deprived of the power to distrain, and the tenant of
his power to comply with his agreement to keep "sufficient
distress" on the premises to satisfy rent in arrear. But whilst
abolishing distress as a remedy, the legislature declared that
"whenever the right of re-entry is reserved or given to a grantor
or lessor, in any grant or lease, in default of a sufficiency of
goods and chattels whereon to distrain for the satisfaction of
any rent due, such re-entry may be made at any time after de-
fault in the payment of such rent, provided fifteen days' pre-
vious notice of such intention to re-enter, in writing, be given
by such grantor or lessor, or his heirs or assigns, to the grantee
or lessee, his heirs, executors, administrators or assigns, not-
withstanding there may be a sufficiency of goods and chattels
on the lands granted or demised, for the satisfaction thereof."
I do not think the effect of this statute was to repeal the arti-
cle of the revised statutes, entitled "of the recovery of the pos-

session of demised premises for non-payment of rent." The effect rather was to render inoperative the words in § 30, "and no sufficient distress can be found on the premises," &c. As the law stood prior to 1846, the landlord, for condition broken, might have proceeded at common law, or under the statute, to re-enter and repossess himself of the premises. The tenant covenanted to pay the rent, and further stipulated that if he broke the covenant the grantor might re-enter. He also agreed that a sufficient distress should always be found on the premises to satisfy any rent in arrear. The legislature, in 1846, abolished the remedy by distress for rent; thus practically rendering it unimportant whether sufficient distress could be found on the premises or not. Whilst taking away one of the remedies of the grantor in a case where a right of re-entry was reserved, another was substituted. Before, the grantor might re-enter in case of a failure of the tenant to keep a sufficient distress on the premises to satisfy arrears of rent; but by the statute of 1846 he was authorized to re-enter at any time after default made in the payment of such rent, provided he gave notice in writing to the grantee or lessee, his heirs, executors, administrators or assigns, fifteen days previously, of such intention to re-enter, notwithstanding there might be a sufficiency of goods and chattels on the lands granted or demised, for the satisfaction of rent due. In *Van Rensselaer* v. *Snyder*, (3 *Kern.* 299,) it was held that this was a new remedy provided for the landlord to enforce the collection of the debt due to him, in lieu of that by distress. Whether this be so or not, there is nothing in the act of 1846 expressly repealing the prior statute giving an action of ejectment for the non-payment of rent; nor do the provisions of the former repeal the latter by implication. The case cited was ejectment brought under the statute, after the law of 1846 was enacted, for the non-payment of rent accruing upon an indenture similar, in all respects, with those under consideration. The idea was not intimated, by court or counsel, that the statute remedy had been affected; but it was held that

---

the law of 1846 was valid, the notice of intention to re-enter (like those in the present cases) sufficient, and the plaintiff (the devisee of the grantor in the indenture) entitled to recover.

The judgments of the circuit court in the cases of *Van Rensselaer* v. *Ball,* and *Van Rensselaer* v. *Hays,* should be affirmed. The judgments of the special term in the cases of *Van Rensselaer* v. *Smith,* and *Christie et al. assignees, &c.* v. *De Friest,* should also be affirmed.

HARRIS, J., concurred.

Judgment accordingly.

[ALBANY GENERAL TERM, May 3, 1858. *W. B. Wright, Harris* and *Gould,* Justices.]